## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
|  | ) |
|  | ) |
|  | ) **Criminal Action No.** |
| **v.** | ) **23-10202-FDS-1** |
|  | ) |
|  | ) |
| **LINDSAY GROVES,** | ) |
|  | ) |
| **Defendant.** | ) |
_____)


### MEMORANDUM AND ORDER ON
### DEFENDANT'S COMPETENCY TO STAND TRIAL

**SAYLOR, J.**

Defendant Lindsay Groves is charged with sexual exploitation of children in violation of

18 U.S.C. § 2251(a) and distribution of child pornography in violation of 18 U.S.C.

§ 2252A(a)(2).  The conduct on which the indictment is based occurred while she was employed

as a teacher at a daycare center in Tyngsborough, Massachusetts.  In substance, she is charged

with taking nude photographs of young children at the request of her then-romantic partner, co-

defendant Stacie-Marie Laughton.

Currently at issue is defendant's mental competency to stand trial.  After a hearing, and

careful consideration of the testimony of the parties' expert witnesses, the post-hearing briefing,

and the supporting audio, video, and documentary evidence, the Court finds that defendant

satisfies the statutory standard for competency:  that is, she is able to "understand the nature and

consequences of the proceedings against [her]" and "assist properly in [her] defense."  *See* 18

U.S.C. § 4241(a).

There is no question that defendant has a number of developmental or psychological

impairments that affect her ability to acquire and process information and communicate with others. Both expert witnesses agree that she has a language disorder. Both also agree that she has at least a mild cognitive impairment, which defendant's expert witness determined meets the criteria for borderline intellectual functioning. Both also concluded that she suffers from anxiety, particularly situational anxiety, which tends to magnify the impact of her other deficits under certain circumstances.

Nonetheless, the Court finds that defendant is competent to stand trial. To begin, she does not suffer from delusions, hallucinations, distorted thinking, or any form of personality disorder. She has not suffered a traumatic brain injury, or any similar organic damage. Indeed, she has no significant history of mental-health symptoms or diagnoses. And she is able to have rational and ordered conversations that evidence a clear understanding of the facts of her case and a basic grasp of the relevant legal issues.

It is certainly true that she has had language and other issues throughout her life. She was, for example, placed in special-education classes in high school and was subject to an individualized education plan. But she nevertheless graduated from high school and then earned an associate's degree in early-childhood education (although she required five years to complete a two-year program). She has held full-time employment as a teacher in a child-care facility and as a line cook in a diner. Putting to one side the charged offenses, she performed the requirements of both positions successfully, and was never disciplined, demoted, or fired from any job before her arrest in this matter.

It is also true that defendant presents as quite immature and unsophisticated, and may well be easily manipulated by others. Despite the terrible nature of the charged crimes, she has

many qualities that evoke a sympathetic response.  But none of that undermines the basic conclusion that she is competent to stand trial.

In short, defendant has repeatedly shown that despite her many limitations, she is capable of ordered thinking and rational communication, and that she has the ability to navigate reasonably complex situations, including obtaining higher education and holding employment for extended periods.  She understands the essential nature and potential consequences of the alleged crime, and can provide meaningful assistance to her defense.  Accordingly, and for the reasons that follow, the Court concludes that, notwithstanding her limitations, she is competent to stand trial.

## I.    Background

### A.    Factual Background

#### 1.    Arrest and Indictment

On June 20, 2023, the Nashua, New Hampshire Police Department received information that Stacie-Marie Laughton had shown photographs to a peer support group that appeared to be of nude children.  During police interviews, Laughton reported receiving the pictures from Lindsay Groves, who was then working as a teacher at a daycare center in Tyngsborough, Massachusetts.

Acting on that information, the police obtained a search warrant for Groves's home and executed it on June 21, 2023.  During the search, the officers conducted an interview of Groves, during which she admitted having taken multiple pictures of prepubescent children at her place of work between June 2022 and June 2023.  Specifically, she told investigators that she would direct the children to pull their clothing up toward their heads where their faces would be obscured as she captured images of their genitalia with her cell phone.  Investigators later

discovered several thousand text messages between Groves and Laughton discussing explicit photographs that she had taken at the daycare center.

Based on the evidence collected and that interview, Groves was arrested and charged with sexual exploitation of children in violation of 18 U.S.C. § 2251(a) and distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2).

### 2.     Competency Evaluations

On July 19, 2023, defense counsel engaged Dr. Tina Adams, an independent clinical and forensic psychologist, to conduct an evaluation of defendant to assess her competency to stand trial. (Adams Report at 1). Dr. Adams conducted the competency evaluation over the following months. (*Id.* at 2-3). As set forth in her final report, Dr. Adams opined that she was not competent to stand trial. (*Id.* at 18).

Based on Dr. Adams's findings, on April 4, 2024, defendant moved for a hearing to determine her competency to stand trial. On June 28, 2024, the magistrate judge found reasonable cause to believe that she may be suffering from a mental disease or defect rendering her mentally incompetent under § 4241. He therefore directed that she be committed to the custody of the Attorney General for placement at a suitable facility for the purpose of having a psychiatric examination conducted by a licensed provider at that facility. The findings of the examination were to be included in a report filed with the court.[1]

Dr. Lauren Schumacher, a forensic psychologist employed by the Bureau of Prisons ("BOP") at the Federal Detention Center in Miami, Florida ("FDC Miami"), conducted the court-ordered competency evaluation of defendant. That evaluation took place at the FDC

---

[1] The magistrate judge directed that the report contain (1) defendant's psychiatric medical history and present symptoms; (2) a description of psychiatric, psychological, and medical tests employed in the examination and their results; (3) the examiner's findings; and (4) the examiner's opinions as to defendant's diagnosis and whether she is suffering from a mental disease or defect rendering her mentally incompetent to stand trial.

Miami facility in the fall of 2024. On November 1, 2024, she submitted her report, in which she opined that defendant was in fact competent to stand trial. (Schumacher Report at 17).

Dr. Adams then submitted an addendum to her report after conducting a follow-up evaluation with defendant on December 9, 2024. The addendum included updated observations of defendant and responses to the findings made by Dr. Schumacher. (Adams Add. at 1-2).

The Court held evidentiary hearings on April 3 and April 10, 2025, at which both Drs. Schumacher and Adams testified. Defendant's father also testified at the April 10 hearing.

Both experts independently conducted multiple clinical interviews and psychological assessments to evaluate defendant's competency. They also reviewed available and relevant evidence, including legal and medical records, in preparing their reports. Each report (1) summarizes defendant's background, (2) describes the respective evaluator's observations of defendant during the corresponding evaluation period, (3) details the methodology and results of the psychological and forensic evaluations performed, and (4) explains the respective evaluator's diagnosis and opinion concerning defendant's competency to stand trial. Both evaluators also had the opportunity to respond to the opposing side's findings and conclusions.[2]

### a.    <u>Defendant's Background</u>

Defendant is a 40-year-old woman who was born and raised in Nashua, New Hampshire. (Schumacher Report at 3).[3] She lived with her parents, who are married, and did not experience abuse or neglect at home. (*Id.*). She had delayed attainment of developmental milestones,

---

[2] Dr. Schumacher incorporated her responses to Dr. Adams's initial examination, which took place approximately one year earlier, in her final report. Dr. Adams then conducted a follow-up interview with defendant in December 2024 and included her observations, along with responses to Dr. Schumacher's findings, in her addendum. Both experts then had an opportunity to respond to the opposing side's findings and conclusions at the evidentiary hearings.

[3] Dr. Schumacher's summary of defendant's background is generally consistent with Dr. Adams's summary, including information she collected from interviews with defendant's parents.

including verbal and motor skills, requiring speech-therapy services while she was in elementary school. (*Id.*). Defendant experienced chronic ear infections as a child, a condition that is believed to have contributed to her speech delays because she struggled to hear auditory information. (*Id.* at 5). She has no history of mental-health symptoms or diagnoses, although she did experience "sporadic" suicidal ideation as a teenager. (*Id.*).

Throughout defendant's schooling, she exhibited language and speech impediments, and as a child, she consistently performed below average on assessments of her cognitive functioning, short-term memory, and processing speed. (*Id.* at 4). As a result of her speech-language impairment, defendant was subject to an individualized education plan ("IEP") in high school and placed in special-education classes. (*Id.*). She went on to successfully graduate from high school.

 After high school, defendant received an Associate of Arts ("AA") degree in early-childhood education from New Hampshire Community College. (*Id.*). However, due to her persistent learning difficulties, she required five years to complete the two-year degree program, despite being enrolled as a full-time student. (*Id.*). Her father testified that during her time in community college, he and her mother provided significant support to help her write coherently and complete her homework. (Tr. Day 1 at 83-86). However, her parents never themselves completed her homework for her. (*Id.* at 87).

Defendant began working at the age of 21 as a dishwasher at a restaurant and was later promoted to a line cook. (Schumacher Report at 4). At age 27, she became a teacher at a childcare facility. (*Id.* at 4-5). Her parents described her as having an "awesome work ethic." (Adams Report at 6). At the time of her arrest, she both had full-time employment as a teacher at a childcare center and worked weekend shifts at a diner. (Schumacher Report at 5). She had

never been fired from a job nor had she ever received disciplinary action from her employer. (*Id.*).

Defendant has never been married and does not have children.  (*Id.*).  After her romantic relationship with Laughton ceased, she took out a Stalking Protection Order against Laughton based on various allegations that Laughton both made false social-media posts about her and called emergency services multiple times alleging that she was suicidal.  (*Id.* at 3-4).

### b.    <u>Evaluations</u>

#### i.    <u>General Observations</u>

Dr. Schumacher reported that throughout her evaluation period, defendant exhibited logical thought processing and a normal range and intensity of emotional expression. (Schumacher Report at 7).  She maintained appropriate eye contact, exhibited adequate hygiene and grooming, and displayed a decline in nervousness as the evaluation progressed.  (*Id.*).  She did not show any symptoms of delusions, hallucinations, or psychomotor retardation.  (*Id.*). Members of the FDC Miami correctional staff also reported that defendant exhibited no behavioral issues or difficulties with communication, self-care, or other daily activities at the facility.  (*Id.*).

However, defendant did express difficulty in her ability to verbally express herself when asked questions concerning her legal process and the allegations against her, frequently stating that her "brain and mouth sometimes don't work together."  (*Id.*).  She also at times struggled to formulate answers to posed questions, stating that her "mind" had gone "blank."  (*Id.*).  She asked for questions to be rephrased multiple times to facilitate her understanding and demonstrated delays in her ability to process information.  (*Id.*).  In addition, her speech was slow and quiet and delivered in a monotone.  (*Id.*).

Defendant acknowledged that her comprehension difficulties were attributable in part to

her lack of familiarity with the legal system and the related anxiety that she felt during the evaluation period.  (*Id.*).  To that end, she exhibited notable fidgeting and restlessness when asked questions related to the legal system and her alleged offense.  (*Id.*).  However, Dr. Schumacher noted that defendant's discomfort dissipated "[a]s rapport was established," and that, over time, she was "forthcoming" in discussing her case.  (*Id.* at 15).

Dr. Schumacher's general observations of defendant largely aligned with those of Dr. Adams, who similarly reported that she made good eye contact throughout her evaluation period and exhibited a cooperative, but reserved demeanor.  (Adams Report at 7).  Dr. Adams also reported that defendant used similar phrases to describe her difficulty with verbal expression, stating, for example, that she "mess[es] [her] words up when [she is] under pressure" and that her "brain and mouth don't work well."  (*Id.*).  And like Dr. Schumacher, Dr. Adams observed that defendant's speech impairment worsened when she became nervous and overwhelmed.  (*Id.*).

### ii.      Cognitive Assessments

Both examiners conducted several psychological examinations to assess defendant's cognitive functioning.[4]  Dr. Adams began by administering the Montreal Cognitive Assessment ("MOCA"), which is comprised of a number of short tasks designed as an initial screen to

---

[4] Both evaluators also conducted multiple examinations to assess defendant's personality characteristics. Dr. Adams administered two measures of personality and psychiatric characteristics:  the Millon Clinical Multiaxial Inventory, Third Edition ("MCMI-III"), and the Minnesota Multiphasic Personality Inventory-2 Restructured Form ("MMPI-2RF").  (Adams Report at 11-12).  Together, the results of those two tests indicated to Dr. Adams that she exhibits characteristics corresponding primarily to mild-to-moderate levels of obsessive-compulsive, schizoid, and narcissistic personality traits, as well as agoraphobia and persecutory ideation.  (*Id.* at 11).

Dr. Schumacher administered two additional personality examinations in her evaluation:  the Minnesota Multiphasic Personality Inventory, Third Edition, ("MMPI-3") and the Personality Assessment Inventory ("PAI"). (Schumacher Report at 9).  Together, the results of those examinations suggested to Dr. Schumacher that defendant has a generally positive self-concept, but experiences some degree of anxiety-related symptoms and interpersonal struggles.  (*Id.*).  The assessments did not reveal any indication of disordered thinking or other personality disorder. (*Id.*).

The parties do not substantially rely on the findings of the personality-disorder tests in asserting their positions as to defendant's competence to stand trial.

determine whether an individual has any cognitive-function impairment, including his or her ability to understand, reason, remember, and focus. (Adams Report at 9). Dr. Adams reported that defendant failed to execute basic tasks such as drawing a specific time on an analog clock, recalling and repeating words and number sequences, and completing simple mental arithmetic problems. (*Id.* at 8). Dr. Adams gave her a score of 18, reflecting mild cognitive impairment.[5]

Dr. Adams also administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV") exam, which comprises multiple sub-tests designed to measure an individual's overall level of cognitive and intellectual functioning as compared to same-aged peers in the general population. (*Id.* at 9). Defendant scored in the second percentile on verbal comprehension; fourteenth percentile in perceptual reasoning; second percentile in working memory; tenth percentile in processing speed; fourth percentile on the general ability index; and third percentile on her full-scale intelligence quotient ("IQ"), which measured at 71, but within a range spanning several points in either direction. (*Id.* at 10; Tr. Day 1 at 194). According to Dr. Adams, defendant's scores reflected a difficulty to learn and understand information—a difficulty that increases as the subject matter becomes more complex. (Adams Report at 10).

Next, Dr. Adams administered the Test of Memory Malingering ("TOMM"). The TOMM is designed to determine whether an individual has a *bona fide* memory impairment or is malingering. (*Id.* at 12).[6] Any score below 45 on the TOMM signifies a likelihood that the patient is malingering—that is, purposefully putting forth minimal effort, thereby obscuring the

---

[5] A score for normal cognition on the MOCA is 26-30 points. Mild cognitive impairment corresponds to a range of 18-25 points; moderate cognitive impairment corresponds to 10-17 points; and severe cognitive impairment corresponds to a score below 10 points. (Adams Report at 9).

[6] During the TOMM, a patient is shown 50 pictures for three seconds each, with a one-second interval in between pictures. The patient then repeats that process and is once again presented the 50 pictures. Later, the patient is shown 50 recognition panels, which each contain one previously presented picture and one new picture. The test requires the patient to recognize and select the picture that they had seen previously. (Adams Report at 12).

objective-test results.  (*Id.* at 13).  Defendant scored 50 on the test, indicating that she was not malingering.  (*Id.*).  Separately, Dr. Adams noted that the TOMM typically takes 15 minutes to complete, but that defendant required one hour and 45 minutes.  (*Id.* at 12-13).

During Dr. Schumacher's evaluation of defendant, she administered the Woodcock Johnson Tests of Cognitive Abilities, Fourth Edition ("WJ-IV COG").  The WJ-IV COG assesses various aspects of cognitive ability, including comprehension and knowledge; fluid reasoning; short-term working memory and long-term retrieval; and cognitive, auditory, and visual processing.  Dr. Schumacher elected to administer the exam because of defendant's history of speech and language impairments and specialized education services.  (Schumacher Report at 8).

Defendant's results demonstrated relative weakness in her general intellectual ability, vocabulary knowledge, and short-term working memory.  (*Id.*).  However, she showed relative strength in fluid reasoning, which refers to her ability to reason, form concepts, and solve problems using unfamiliar information.  (*Id.*).  Moreover, she performed relatively well on a test of quantitative reasoning and inductive reasoning.  (*Id.*).

While taking the WJ-IV COG exam, defendant concurrently completed the Validity Indicator Profile ("VIP"), which is designed to detect whether an examinee's performance on the WJ-IV COG is affected by mental fatigue or decreased effort.  (*Id.*).  According to her VIP measurement, defendant obtained lower scores on the WJ-IV COG test than would have been expected had she put forth full and consistent effort throughout the entire examination.  (*Id.*). Defendant's VIP-adjusted score estimates that her reasoning abilities are in fact roughly average, and that her WJ-IV COG results underrepresented her intellectual functioning because her effort level decreased when she faced increasingly difficult tasks.  (*Id.*).

10

### iii.    Forensic Assessments

##### (A)    Competence Assessment for Standing Trial for Defendants with Intellectual Disability

To evaluate defendant's understanding of the legal process, including her comprehension of the nature and consequences of the charges that she faces and her ability to assist in her defense, Dr. Adams performed the Competence Assessment for Standing Trial for Defendants with Intellectual Disability ("CAST*ID").  (Adams Report at 3).  The CAST*ID is an instrument designed specifically to determine whether an intellectually disabled defendant is competent to stand trial.  (*Id.* at 14).  It is meant to be used on adults with mild to moderate intellectual disability; based on defendant's IQ score and poor verbal-comprehension skills, Dr. Adams determined that defendant had met the threshold intellectual-disability requirement to take the CAST*ID.  (Tr. Day 1 at 194).

The assessment comprises 50 items divided into three sections that address each component of the legal test for competency.  Section 1, called "Basic Legal Concepts," assesses the defendant's knowledge of the criminal-justice system, such as the meaning of a trial and the functions of a jury and defense attorney.  (Adams Report at 14).  It is comprised of 25 multiple-choice questions, with three possible choices and only one correct response.  (*Id.* at 15).  Section 2, called the "Skills to Assist Defense," measures the defendant's understanding of the attorney-client relationship.  (*Id.* at 14).  It comprises 15 multiple-choice questions, again with three possible choices and one correct response.  (*Id.* at 15).  And Section 3, called "Understanding Case Events," evaluates the defendant's ability to discuss the facts of her case and their connection to the arrest and prosecution.  (*Id.* at 14-15).  It comprises 10 open-ended questions and is graded by the examiner using the scoring paraments set forth in a corresponding test manual.  (Tr. Day 1 at 69).

To conduct the assessment, the examiner reads each question aloud while the defendant follows along on a written form.  (Adams Report at 15).  The examiner records the defendant's answers, along with other relevant information, such as whether the defendant requested that the questions be repeated.  (*Id.*).  The defendant can earn one point for each correct response to the multiple-choice questions in sections 1 and 2.  For section 3, the defendant can earn 1, 0.5, or 0 points for each question, depending on the level of detail, accuracy, and quality of her response.  (*Id.*).  A score of 0 is appropriate when the defendant provides a vague answer absent of any relevant detail.  (Tr. Day 2 at 10-11).  When a defendant provides a relevant answer, then a score of 0.5 or 1 is appropriate, depending on the accuracy of the response.  (*Id.* at 11).  The examiner is permitted to ask follow-up questions to elicit additional information from the defendant.  (*Id.*).  At the end of the examination, the defendant's final scores are compared to the scores of individuals in a normative sample who (1) have intellectual disabilities and (2) were deemed competent to stand trial.

On section 1, defendant received a score of 88 percent, compared to the normative-sample score of 62 percent, indicating that she is competent as to her understanding of basic legal concepts.  (Adams Report at 15).  On section 2, defendant received a score of 86 percent, compared to the normative-sample score of 68 percent, indicating that she is competent as to her ability to assist in her defense.  (*Id.*).[7]  However, on section 3—the open-ended-question portion of the exam—defendant received a score of 35 percent, compared to the normative-sample score

---

[7] Dr. Schumacher testified that there were certain discrepancies in Dr. Adams's tallying of defendant's correct responses in sections 1 and 2.  (Tr. Day 1 at 70).  On section 1, Dr. Schumacher testified that Dr. Adams transcribed a score of 24 points (96 percent), even though defendant correctly answered only 23 questions (92 percent) correctly.  (*Id.*).  And Dr. Adams's report indicates that defendant answered 22 questions (88 percent) correctly.  (Adams Report at 15).  Similarly, on section 2, Dr. Schumacher testified that defendant answered 14 questions (93 percent) correctly, (Tr. Day 1 at 71), even though Dr. Adams's report indicates that defendant answered 13 questions (86 percent) correctly, (Adams Report at 15).  Regardless, each of those scores are well above the thresholds for individuals deemed competent (62 percent on section 1 and 68 percent on section 2).

of 55 percent, indicating that she is not competent with respect to her understanding of the events of the case. (*Id.* at 16).

Beyond defendant's raw scores, Dr. Adams reported that defendant would take significant pauses before answering the questions. She also reported that on occasion, defendant requested that a question be repeated, and would sometimes answer questions tentatively. (*Id.*).

After reviewing Dr. Adams's CAST*ID notes and scoring determinations, Dr. Schumacher concluded that defendant's performance on section 3 had been incorrectly assessed, resulting in an understated score. (Schumacher Report at 6).[8] Dr. Schumacher reviewed all responses provided by defendant, and, in consultation with the test manual, re-scored defendant's responses to each of the 10 open-ended questions in section 3. (*Id.*). She calculated a total score of 70 percent (as opposed to 35 percent) on section 3, placing defendant above the normative-sample score achieved by intellectually disabled individuals deemed competent to stand trial. (*Id.*). Another forensic psychologist reviewed and concurred with Dr. Schumacher's re-scoring of defendant's performance. (Tr. Day 1 at 72, 77-78).

Dr. Schumacher assigned points to multiple section 3 responses for which Dr. Adams provided a score of 0. For example, Question 47 of the exam asked defendant what the police said to her, and what she said back. (Tr. Day 2 at 64). She responded by saying, "I don't remember all the questions they were asking because—ugh, a couple of them were about my hobbies and what I did for work, and that's all I could remember. They asked me a lot of questions." (*Id.* at 65). In response to a follow-up question, defendant said that she believed that

---

[8] Dr. Schumacher did not separately administer a CAST*ID examination to defendant because she did not diagnose an intellectual disability, which is a prerequisite for administering the examination. (Tr. Day 1 at 68). However, she nonetheless analyzed Dr. Adams's administration of the CAST*ID and re-scored defendant's performance based on Dr. Adams's written notes and observations.

the police read her rights; searched her house pursuant to a search warrant; arrested her; again read her rights; and transferred her to the Nashua Police Department. (*Id.* at 65-66). Each of those details was accurate. However, Dr. Adams assigned defendant a score of 0 for that response because she omitted certain questions asked of her by the police officer on the day of her arrest. (*Id.* at 66).

Similarly, in response to Question 48, which asked defendant to list the charges brought in the case, she answered, "child pornography and I forget." (*Id.* at 67). Because defendant failed to identify the sexual-exploitation charge and mention "distribution" of child pornography, Dr. Adams gave her a score of 0 for her response. (*Id.*). And on Question 50, which asked defendant about the severity of the charges, she responded "pretty serious." (*Id.* at 68). Dr. Adams assigned that response a half-point because the charges are "very serious," not just "pretty serious." (*Id.*).

Dr. Schumacher disagreed with Dr. Adams's scoring of those questions, among others, and testified that defendant's responses in section 3 of the CAST*ID reflected an ability to explain the specific circumstances concerning her arrest, the alleged conduct at issue, the basic charges, and the severity of the alleged crime. (Tr. Day 1 at 75). Based on Dr. Schumacher's re-scoring of defendant's section 3 responses, she would have scored well above the normative-sample score to be deemed competent to stand trial.

Moreover, Dr. Schumacher testified that, aside from the scoring discrepancies, there were also opportunities for defendant to have earned even more points had Dr. Adams posed follow-up questions calling for further elaboration from her. For example, when asked where the alleged offense occurred, defendant responded by saying it was in a daycare; Dr. Adams assessed a one-half-point score for that response instead of following up to inquire about, for example, the

name of the daycare center.  (*Id.* at 76).  Even without those follow-up questions, however, Dr.

Schumacher's scoring of defendant's CAST*ID section 3 performance places her within the

range of defendants who have been found competent.

Based on the testimony at the hearing and a review of the evidence, the Court finds that

the conclusions of Dr. Schumacher concerning the scoring of the CAST*ID assessment are

credible and well-supported by the evidence, and accepts her interpretation of the results.

### (B)    Evaluation of Competency to Stand Trial-Revised

During her evaluation of defendant, Dr. Schumacher conducted an Evaluation of

Competency to Stand Trial-Revised ("ECST-R") to assess defendant's legal comprehension and

understanding of her case.  (Schumacher Report at 11).[9]

The ECST-R is an objective measure of legal knowledge and abilities.  (*Id.*).  It

comprises true-false questions that assess four competency-related categories:  (1) a defendant's

ability to consult with counsel; (2) her factual understanding about the courtroom and legal

process; (3) her rational understanding of courtroom proceedings; and (4) her overall rational

ability, which is essentially a combination of the scores from the first and third prongs of the

examination.  (*Id.*).  During the administration of the exam, the evaluator is permitted to provide

education about the legal system to the defendant.  (*Id.*).  The ECST-R therefore enables an

evaluator to assess the defendant's ability to be educated on legal concepts and to retain and later

explain that information.  (Tr. Day 1 at 38).

Despite having no notes or other supplements to aid her responses during the

---

[9] Dr. Schumacher also conducted the Inventory of Legal Knowledge ("ILK").  (Schumacher Report at 11).
The ILK is not a measure of competency to stand trial, but rather is used to assess whether a defendant is feigning
deficits in legal knowledge.  (*Id.* at 11-12).  Defendant's score on the ILK did not suggest any such attempts.  (*Id.* at
12).

examination, (*id.* at 41), defendant did not demonstrate any meaningful impairment across any of the four assessed categories, (Schumacher Report at 11). She demonstrated a factual knowledge of the trial process, an ability to make rational decisions, and a capacity to maintain a productive relationship with her attorney. (*Id.*). For example, defendant discussed her attorney's performance in the case, demonstrated an understanding of her attempts to secure pretrial release, and explained the role of the prosecution in the case. (Tr. Day 1 at 39). She also demonstrated an understanding of the possible outcomes of the case, including the potential prison sentence that she may face, the charges against her, and the factual circumstances surrounding her alleged conduct. (*Id.* at 40). And she showed an ability to work productively with counsel, including explaining the types of evidence and information that would be helpful for her attorney to know. (*Id.*). Thus, on each measured domain, she received a designation of either "no impairment" or "minimal impairment," which is consistent with defendants who are adjudicated competent to stand trial. (*Id.* at 38).[10]

### (C)    Revised-Competency Assessment Instrument

Dr. Schumacher also administered the Revised-Competency Assessment Instrument ("R-CAI"), which serves a similar purpose as the ECST-R, and is used to structure an interview with a defendant to assess 14 competency-related categories. (Schumacher Report at 12). Those categories include, for example, defendant's understanding of the charges against her; the potential penalties that she faces; her understanding of her available defenses; the functions of

---

[10] Dr. Schumacher testified that certain responses by defendant during the ECST-R indicated possible signs of malingering. (Tr. Day 1 at 41-42). For example, defendant answered "true" to a question asking whether she feels numb inside and outside of her body when she goes to court. (*Id.* at 41). Because that is an atypical symptom for someone with a mental illness, such a response raises an indication for an examiner to further assess malingering. (*Id.* at 42). However, based on defendant's performance during the remainder of the ECST-R and on subsequent evaluations, Dr. Schumacher found that defendant was not malingering and that such a classification was not warranted. (*Id.*).

the courtroom participants; the likely outcomes of her case; her capacity to work rationally with counsel; her capacity to disclose pertinent information to counsel; and her ability to testify. (*Id.*).

Defendant's responses demonstrated a comprehension of the nature and consequences of the charges that she faces and an ability to work properly with counsel. (*Id.* at 13-15; Tr. Day 1 at 42). When discussing the nature of her legal proceedings, defendant consistently identified that she has been charged with "child pornography." (Schumacher Report at 13). Consistent with her responses during the CAST*ID, she struggled to recall the precise name of her sexual-exploitation charge, but could accurately discuss the alleged conduct associated with that charge, including that she was accused of taking illicit photographs of children at the daycare where she worked and distributing the photographs by text message. (*Id.*). Furthermore, defendant correctly identified the roles and responsibilities of various court personnel, stating that the defense attorney's job was to defend her, and that the jury's job was to find her "guilty or not" based on the evidence. (*Id.*). Defendant also stated that she should not speak with the prosecutor without defense counsel present, although she did not explain the rationale. (*Id.*).

Dr. Schumacher noted in her report that defendant, at times, evidenced delays in her responses to the R-CAI questions, particularly for questions that she found to be more difficult; however, she also noted that defendant was receptive to attempts to educate her about the legal process. (*Id.* at 12). For example, she could not initially explain the differences between fact witnesses, expert witnesses, and character witnesses. (Tr. Day 1 at 43). However, after Dr. Schumacher educated her about the purpose of the different types of witnesses, on her own accord, defendant was able to provide examples of each type of witness in relation to her case. (*Id.*). Similarly, although she could not initially describe the role of the judge, after some educating statements from Dr. Schumacher, she stated that the judge "controls" the courtroom

and makes decisions concerning her guilt and sentencing.  (Schumacher Report at 13).

Defendant also acknowledged that she had the right to choose not to testify, but would make that decision in consultation with her counsel.  (*Id.* at 14).  She further reported that she would feel nervous if she testified in court, but that in the past, she has remained calm in courtroom proceedings.

Moreover, defendant demonstrated an understanding of the plea-bargaining process, stating that pleading guilty meant that she "did do [the crime]," while pleading not guilty meant that she "didn't do it."  (*Id.*).  She noted that she would work with her counsel to evaluate any plea offer.  However, she demonstrated confusion concerning the timeline of the plea bargaining; Dr. Schumacher understood her confusion to be related to her unfamiliarity with the legal system, as opposed to cognitive impairment.  (*Id.*).

Furthermore, defendant correctly identified that she faced felony charges, which are more serious than misdemeanor charges.  (*Id.*).  She also stated that she recalled learning that she faced 15 to 20 years of prison time, if found guilty, but that other punishments could apply, including being prohibited from being "around children."  (*Id.*).  If found not guilty, defendant stated that she would be released from custody.  (*Id.*).  She also discussed being motivated to achieve a not-guilty verdict so that she could have her "freedom back."  (*Id.*).  She understood that her guilt would be determined based on the evidence presented.  (*Id.*).  She understood that evidence meant "proof" and she identified potential evidence against her, such as the pictures that she had allegedly taken.  (*Id.*).  She then stated that if she was found not guilty, it would be because "they didn't have the evidence for the charges."  (*Id.*).

In terms of her ability to work with counsel, during her R-CAI interview, defendant correctly identified her counsel by name, recalled multiple communications with her counsel,

and expressed a belief that her counsel had gone "above and beyond" in representing her. (*Id.* at

15). She noted, for example, that her counsel had almost secured her pretrial release. (*Id.*).

Defendant demonstrated an understanding that her counsel's role was to defend her, assist her in

the legal process, and help her secure a not-guilty verdict. (*Id.*). And although she expressed an

initial discomfort with speaking about the alleged offense, she attributed that discomfort to her

general uneasiness about the nature of the allegations, not anything specific about the attorney-

client relationship. (*Id.*).

### iv.    Additional Observations

#### (A)    Defendant's Meetings with Defense Counsel

Drs. Adams and Schumacher both observed sessions between defendant and her counsel

to evaluate her ability to understand and make decisions about her case. Dr. Adams observed a

one-hour interaction between them on October 30, 2023. (Adams Report at 13). During that

meeting, defendant was cooperative and responded to all questions asked. (*Id.*). However,

several responses were vague or included an assertion that she could not recall specific

information. (*Id.*). She exhibited particular difficulty discussing the details of her charges and

the legal process as a whole with her counsel. (*Id.*). She was able to identify that the jury would

decide her guilt, and with some education from her counsel, she correctly stated the roles of the

prosecutor, judge, and defense counsel. (*Id.* at 13-14). However, she struggled to answer

questions concerning potential plea agreements. (*Id.* at 14).

On October 17, 2024, Dr. Schumacher observed a two-hour meeting between defendant

and her counsel at the FDC Miami facility. (Schumacher Report at 12). The meeting occurred

one day after Dr. Schumacher had conducted her legal-comprehension interviews with

defendant. (Tr. Day 1 at 46). During her interaction with counsel, defendant demonstrated

significant delays in her responses to questions posed by her counsel, and frequently stated that

she did not understand the question posed or did not know the relevant information.
(Schumacher Report at 12).  At times, she failed to provide any response.  (Tr. Day 1 at 46).
Although she did show some ability to speak about the facts of her case and ability to assist in
her defense, she struggled with questions concerning the role and function of various courtroom
personnel.  (Schumacher Report at 12).  For example, she could not answer a question about
what qualities make a good juror.  (Tr. Day 1 at 46).  Dr. Schumacher testified that her behavior
at the October 17, 2024 meeting stood in "stark contrast to [her] observations" of defendant on
the previous day.  (*Id.* at 47).

Four days later, at a follow-up meeting with defendant, Dr. Schumacher asked why she
struggled to answer the questions posed by her counsel, especially those same questions that she
had successfully answered when posed by Dr. Schumacher a few days prior.  (Schumacher
Report at 12).  Defendant reported that she had experienced heightened anxiety when speaking
with her attorney, and that she struggled to understand her attorney's phrasing of the questions.
(*Id.*).  Specifically, she struggled with questions asking her to recall specific information.  (*Id.*).
Furthermore, she explained that the different settings of the meetings—she had met with Dr.
Schumacher in a psychology office, but with her counsel in a visitation room at the prison
facility—added to her anxiety.  (Tr. Day 1 at 47).  And she added that she felt a general
embarrassment about the case and allegations against her, contributing to her situational anxiety.
(*Id.*).

At the December 9, 2024 follow-up evaluation with Dr. Adams and defense counsel,
defendant again provided little to no response to most questions posed by them.  (Adams Add. at
4).  The questions touched on the specific facts of her case, the charges against her, and the
operations of courtroom procedures.  (*Id.*).  Although she mostly exhibited delayed responses or

no responses during the interview, she was able to recall certain prior conversations with her counsel and could state basic information about the role of the judge and her attorney. (*Id.* at 5). She also responded better when provided visual aids and diagrams of the courtroom. (*Id.*). Finally, Dr. Adams noted that her responses varied when posed with non-legal questions; although she responded in "a clear and logical manner" when asked about a recent leg infection, she remained silent when asked to list her three favorite foods. (*Id.* at 4-5).

### (B)    Defendant's Telephone Communications

Dr. Schumacher also reviewed monitored telephone communications between defendant and her parents. (Schumacher Report at 7). Throughout those phone calls, she engaged in reciprocal conversation, answering all the questions that were posed to her with minimal delays. (*Id.*). She did not require any clarifications or repetitions of the questions posed to her. (*Id.*). Her responses were consistently logical and reflected an understanding of her situation.

Many of the conversation topics were limited and simplistic, largely focused on her daily activities at the correctional facility. However, at various points, she coherently discussed her competency-evaluation process and other aspects of her legal case. For example, on multiple occasions, she accurately conveyed relevant information to her mother that Dr. Schumacher had previously shared with her. (Tr. Day 1 at 48, 52, 55). At one point, Dr. Schumacher had explained to her the difference between a bench trial and a jury trial; later that day, in a call with her mother, defendant noted that a bench trial involved the judge and stated that she understood the role of jury. (*Id.* at 52). And she accurately communicated information provided by Dr. Schumacher about an upcoming meeting with her attorney. (*Id.*).

Defendant also accurately shared information that she had heard at a previous court appearance, and expressed to her mother her proper understanding of the role of the prosecutor in the case. (*Id.* at 50). She also discussed information relevant to her interactions with her co-

defendant, including information contained in discovery records. (*Id.* at 54-55). And she demonstrated an ability to discuss an acquaintance's legal case, including possible outcomes of her upcoming jury trial. (*Id.* at 51). Overall, her telephone calls reflected an ability to accurately recall, understand, and communicate information about her legal process to her parents. (*Id.*).

### (C)    Defendant's Interview with Nashua Police

Both experts reviewed video footage of defendant's interaction with a Nashua police officer at approximately 2:15 a.m. on June 21, 2023, the day of her arrest. In that video, a police officer interviewed defendant about a range of topics, including her alleged conduct, her place of employment, and her (now) co-defendant, Stacie-Marie Laughton. As Dr. Schumacher testified, over the course of the approximately 75-minute interview, she did not exhibit any significant deficits in her ability to respond relevantly to the officer's questions. (Tr. Day 1 at 20). For example, when asked about her education level, she readily explained that she graduated with an AA degree. (Ex. 5 at 15:20). When asked about her employment, she described her various jobs in detail, explaining that her "main job" was teaching at Creative Minds daycare center, but that she also cooked at a diner on the weekends and held a seasonal Halloween position at Canobie Lake Park. (*Id.* at 20:45, 22:09, 22:58). Throughout the interview, she also engaged in typical small talk, including discussing her hobbies. At certain points, she expressed that she felt nervous and needed a moment to think because she was not fully awake, (*id.* at 16:00); nonetheless, she consistently answered the officer's questions in a relevant and reasonably fluid manner.

Defendant was also able to engage in a back-and-forth dialogue with the officer about the alleged photos that she had taken on her phone at the daycare center. She initially denied taking the photos, asserting that she would not have passed a background check or retained her job at the daycare center had she engaged in such conduct. (*Id.* at 46:30). When asked about

22

Laughton, she initially shared only that Laughton was manipulative and that she had a restraining order against Laughton. However, when presented with evidence that connected her to the alleged photos, defendant admitted to taking them, but that she did so only to appease Laughton. (*Id.* at 57:46). She then described the specific factual circumstances of the alleged conduct and her relationship with Laughton at length with the officer. Again, although she appeared nervous at times, defendant was able to engage in a nearly 75-minute reciprocal conversation with law enforcement about her alleged conduct with essentially no meaningful delays. (Tr. Day 1 at 20-21; *see* Ex. 5).

Dr. Adams noted that defendant did not appear to understand her *Miranda* rights when they were provided to her orally and in writing. (Adams Report at 19). At the beginning of the interview, the officer read defendant's *Miranda* rights aloud; when asked if she understood each of her rights, she responded "yeah" each time. (Ex. 5 at 17:15). The officer then asked defendant to read a waiver of *Miranda* rights printed on a physical form; he also offered to read the waiver out loud if she preferred. (*Id.* at 18:35). Defendant took the paper momentarily but then handed it back and asked him to read it out loud, which he did. (*Id.* at 18:43). Then, when asked if she was comfortable speaking with the officer without a lawyer, she responded "yeah," and, without asking any questions, signed the form. (*Id.* at 19:30).

Dr. Adams reported that in her subsequent meetings with defendant, she failed to recall the specific rights that she waived with the Nashua police. (Adams Report at 19). Dr. Adams observed that after defendant waived her *Miranda* rights in the video, she appeared to then unknowingly provide self-incriminating evidence to the officer because she has "blind" trust in authority figures and limited rational understanding of her context. (*Id.* at 19-20).

c.      **Diagnoses and Opinions**

i.      **Dr. Adams**

Based on the evaluations and review of defendant's history, Dr. Adams diagnosed a Language Disorder, as defined in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition-Text Revision ("DSM-V-TR"). (Adams Report at 17). Symptoms of Language Disorders include impaired processing and language expression. (*Id.*). Dr. Adams also concluded that defendant meets the criteria for Borderline Intellectual Functioning ("BIF") based on her low-level cognitive ability.[11] Dr. Adams testified that those classifications are based on her findings that defendant has deficits in her executive-functioning skills, including memory, abstract reasoning, and verbal expression. (Tr. Day 1 at 179). Dr. Adams also concluded that she suffers from situational anxiety related to her legal case, and that her anxiety exacerbates her learning and language difficulties, differentiating her condition from the typical anxiety that one may feel in a stressful situation. (Adams Report at 17; Tr. Day 2 at 27-28).

Dr. Adams therefore opined that defendant is not competent to stand trial. (Adams Report at 18). Although Dr. Adams acknowledged that she could ably communicate in certain contexts, she stated that her Language Disorder interferes with her ability to communicate with her attorney about her legal case. (Tr. Day 1 at 183). Dr. Adams also cited defendant's IQ score of 71 and her performance on the CAST*ID as evidence that she has low comprehension, weak verbal-reasoning skills, and a limited ability to sustain attention and exert mental effort. (Adams Report at 18). As to her CAST*ID performance specifically, although she performed relatively well on sections 1 and 2, Dr. Adams opined that she was nonetheless not competent because of

---

[11] Both experts recognize that BIF is not a standalone disorder under the DSM-V-TR, but rather a classification of an individual's capabilities.

her inability in section 3 to provide a narrative of her understanding of the facts and choices concerning her case. (*Id.* at 17). Dr. Adams opined that her inability to effectively answer the questions in section 3 also may indicate that she was guessing in the prior sections, rather than answering the multiple-choice questions with some level of knowledge. (*Id.* at 16). And given her situational anxiety, which Dr. Adams testified worsens when she struggles to formulate a response to a question, she opined that she is not able to meaningfully engage in her legal proceedings. (*Id.*; Tr. Day 2 at 38).

Finally, Dr. Adams opined that even when defendant communicates coherently, she may not actually understand what she is talking about because she is engaging in "masking." (Tr. Day 1 at 181). Masking occurs when a patient attempts to hide their mental deficits out of embarrassment. (*Id.*). Typically, masking manifests in the parroting back of phrases that the defendant hears in the posed question. (*Id.*). Dr. Adams concluded that her coherent responses were often reflective of her masking, and thus overstated her understanding of her legal matter.

### ii.    **Dr. Schumacher**

Dr. Schumacher also diagnosed Language Disorder, as set forth in the DSM-V-TR. (Schumacher Report at 10). That diagnosis was based on defendant's long-standing weakness in understanding material presented verbally and her slowed processing speed. (*Id.*). It was also based on the communication deficiencies that she exhibited during her evaluation period with Dr. Schumacher, even though those deficiencies were less notable in non-evaluative contexts. (*Id.*). Dr. Schumacher did not conclude that defendant was malingering or feigning her mental deficits, (Tr. Day 1 at 42), although she did note that mental fatigue may have lowered her performance on certain evaluations, (Schumacher Report at 8).

Dr. Schumacher also diagnosed Unspecified Anxiety Disorder based on defendant's apparent stress-induced fear and anxious behavior during the evaluation period, especially when

discussing case-specific information. (*Id.*; Tr. Day 1 at 59-60). However, Dr. Schumacher expressed diagnostic uncertainty as to defendant's anxiety given her lack of distress in daily functioning and the absence of definitive testing data on that condition. (Schumacher Report at 10; Tr. Day 1 at 60).[12]

Dr. Schumacher nonetheless opined that defendant is competent to stand trial, finding that her mental conditions do not interfere with her understanding of the legal proceedings or ability to assist in her defense. (Schumacher Report at 16). In reaching her opinion, Dr. Schumacher emphasized her ability to process and communicate information—including legal information—in various contexts, such as during her interviews with Dr. Schumacher, the interview with the Nashua Police, and the phone calls with her parents. (*Id.*). She also noted that her competency was understated by Dr. Adams's CAST*ID scoring, and that her true performance on that exam fell well within the competent range. (Tr. Day 1 at 58).

Dr. Schumacher also emphasized that defendant has demonstrated an ability to perform even better when provided education and support. (Schumacher Report at 16). For example, although she lacks experience with the legal system, she was able to understand and learn about various aspects of her case and the legal process from Dr. Schumacher throughout her evaluation. (*Id.*; Tr. Day 1 at 38). Moreover, in her personal life, she earned an AA degree with accommodations and support from the school and from her parents. (Schumacher Report at 16).

Dr. Schumacher suggested that the use of courtroom accommodations, such as providing periodic breaks and additional time during hearings, may further mitigate the impact of her

---

[12] Dr. Schumacher declined to provide a classification of BIF to defendant, given the variations in her performance across assessment measures. (Schumacher Report at 10). Although defendant's IQ score reflected borderline intellectual functioning, her WJ-IV COG evaluation revealed low-average abilities, which may even have been understated based on her VIP measurement. (*Id.*). Moreover, defendant's sustained ability to effectively manage her daily living tasks further militated against a BIF diagnosis. (*Id.*).

language and anxiety disorders. (*Id.*). However, even without such accommodations, Dr. Schumacher opined that she is sufficiently competent to stand trial. (*Id.* at 17).

### B.    Procedural Background

Defendant was initially charged by complaint on June 22, 2023, and then by indictment on July 27, 2023. On August 11, 2023, the magistrate judge granted defendant's motion for pretrial release. The government then moved for a revocation of defendant's pretrial release, which the Court granted on September 20, 2023.

On April 4, 2024, defendant moved for a hearing to determine her competency to stand trial based on Dr. Adams's findings. Dr. Schumacher conducted a court-ordered competency evaluation in the fall of 2024 and submitted her final evaluation of defendant on November 1, 2024. The Court held evidentiary hearings on April 3 and April 10, 2025, at which both Drs. Schumacher and Adams testified.

The parties filed post-hearing arguments on April 25, 2025, and reply briefs on May 2, 2025. The parties then presented closing arguments at a May 9, 2025 hearing, after which the Court took the matter under advisement.

## II.    Analysis

### A.    Legal Standard

"[I]t is well settled that the conviction of a person legally incompetent to stand trial violates due process." *United States v. Brown*, 669 F.3d 10, 17 (1st Cir. 2012) (citing *Johnson v. Norton*, 249 F.3d 20, 26 (1st Cir. 2001)). However, "[c]ompetency to stand trial is considerably narrower than competency generally." *United States v. Malmstrom*, 967 F.3d 1, 4 (1st Cir. 2020). Indeed, the fact "[t]hat mental health issues exist . . . is not a *per se* bar to a finding of competency to stand trial." *Id.* at 5 (citing *United States v. Widi*, 684 F.3d 216, 221 (1st Cir. 2012)).

To be competent to stand trial, a defendant must have (1) "a rational as well as factual understanding of the proceedings against [her]" and (2) a "sufficient present ability to consult with [her] lawyer with a reasonable degree of rational understanding." *See United States v. Ahrendt*, 560 F.3d 69, 74 (1st Cir. 2009) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)); *see also United States v. Kenney*, 756 F.3d 36, 43 (1st Cir. 2014) (stating that the test for competency "has a modest aim . . . to ensure that the defendant has the capacity to understand the proceedings and to assist counsel").[13]

Competency to stand trial "is a functional concept[.]" *Malmstrom*, 967 F.3d at 4. Thus, "[t]he 'understanding' required is of the essentials—for example, the charges, basic procedure, possible defenses—but not of legal sophistication." *Brown*, 669 F.3d at 17 (quoting *Robidoux v. O'Brien*, 643 F.3d 334, 339 (1st Cir. 2011)). Meanwhile, the communication between attorney and client need not be seamless, although the defendant must be able to "assist meaningfully in the preparation and presentation of [her] defense." *See Malmstrom*, 967 F.3d at 5. Courts consider a number of factors in assessing a defendant's ability to effectively assist in her defense, including the ability to review and understand the evidence in the case; the ability to consider alternative strategies to standing trial; the ability to rationally decide whether to testify, and to testify coherently; and the ability to discuss testimony with counsel. *See United States v. Marks*, 2022 WL 8227893, at *34 (M.D. Fla. Apr. 15, 2022), *report and recommendation adopted*, 2022 WL 4129539 (M.D. Fla. Sept. 12, 2022). Importantly, there is no requirement that a defendant be able to "in real-time, or near real-time, intelligently assist counsel in strategic decision during an ongoing trial." *United States v. Bennett*, 2017 WL 2625070, at *16 (E.D. Va. June 16, 2017).

---

[13] The test for a defendant's mental competency to stand trial is the same as that of a defendant's competency to plead guilty. *United States v. Lebron*, 76 F.3d 29, 31 (1st Cir. 1996).

In conducting the competency analysis, "courts may rely on a variety of sources, including written medical opinions and observations by the court, counsel, and defendant [herself] as to the defendant's demeanor and fitness to stand trial." *United States v. Ortiz-Marrero*, 609 F. Supp. 3d 59, 66 (D.P.R. 2022) (citing *United States v. Muriel-Cruz*, 412 F.3d 9, 13 (1st Cir. 2005)). A court may "accept parts of defendant's or an expert's testimony yet reject the ultimate conclusion that they advocated." *Id.* (quoting *Pike v. Guarino*, 492 F.3d 61, 76 (1st Cir. 2007)). In addition, a "district judge may take into account his own observations of the defendant." *Widi*, 684 F.3d at 220.[14]

### B.     Burden of Proof

The First Circuit has not ruled on the issue of whether the defendant or the government bears the burden of proof as to the defendant's competency. *See United States v. Patel*, 524 F. Supp. 2d 107, 110 (D. Mass. 2007) (adopting the views of the Third, Fifth, and Ninth Circuits that the government bears the burden to establish a defendant's competency to stand trial). The governing statute, 18 U.S.C. § 4241, is also silent as to the burden of proof, stating only that "the court must find by a preponderance of the evidence that the defendant is incompetent to stand trial." *Id.* However, under a preponderance-of-the-evidence standard, the allocation of the

---

[14] Under 18 U.S.C. § 4241(a), before evaluating a defendant's competency to stand trial, a court must first determine if there is a "reasonable cause to believe that the defendant [] presently [] suffer[s] from a mental disease or defect rendering [her] mentally incompetent . . . ." 18 U.S.C. § 4241(a). The parties do not dispute that defendant suffers from a mental disease or defect in the form of a language disorder. The parties also both agree that defendant suffers elevated anxiety when discussing her legal case, although the experts differ slightly in their specific diagnoses. The government rejects Dr. Adams's assertion that defendant's BIF classification constitutes a mental disease under § 4241(a) because it is not a formal diagnosis under DSM-V-TR. (Gov't. Br. at 5-6). Defendant agrees that BIF is a classification, not a standalone disorder, but that nonetheless, defendant has an intellectual disability, as evidenced by her IQ score of 71 and her poor verbal-comprehension skills.

Although defendant's intellectual-disability status is relevant in assessing the validity of certain examinations administered by the experts, at this stage, both parties agree that defendant satisfies the threshold issue of demonstrating that she has a mental disease under § 4241(a). The Court will consider defendant's intellectual-disability status in analyzing her competency to stand trial.

burden of proof affects only those "narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Medina v. California*, 505 U.S. 437, 449 (1992).

For present purposes, the Court will assume, without holding, that the government bears the burden of proving by a preponderance of the evidence that defendant is competent to stand trial.

### C.    Competency to Stand Trial

Defendant asserts that she is not competent to stand trial because she suffers from a language disorder that makes it difficult for her to understand, process, and communicate information orally and in writing. She further asserts that she has a borderline intellectual disability and experiences situational anxiety, which exacerbates her language disorder during legal proceedings.

The government agrees that defendant has a diagnosed language disorder, but contends that it is not so severe as to render her incompetent to stand trial because she has repeatedly demonstrated that she understands the nature of the case against her and can assist in her defense.

The government relies principally on the findings and conclusions of Dr. Schumacher, who, after evaluating defendant, opined that she is competent to stand trial, notwithstanding her language and anxiety disorders. Defendant, meanwhile, relies principally on the findings and conclusions of Dr. Adams, who opined that defendant's language disorder, along with her impaired intellectual functioning and situational anxiety, render her incompetent to stand trial.

### 1.    Malingering

As an initial matter, neither expert witness opined that defendant was malingering or otherwise feigning her mental deficits throughout the evaluation period. There is no evidence to suggest that defendant does not, in fact, have a language disorder that interferes with her verbal-

processing speed or that she does not suffer from situational anxiety. Although Dr. Schumacher noted that certain responses during the ECST-R signaled possible signs of malingering, defendant's performance throughout the remainder of the assessment and competency evaluation did not support such a finding. (Tr. Day 1 at 41-42). It is true that defendant's VIP score suggested that her effort may have waned during the WJ-IV COG exam, but there is no assertion that she purposefully put forth minimal effort to obscure the test results. Other evidence, including video and telephone recordings of defendant's communications, corroborate the expert witnesses' conclusions that she has an actual language disorder and has diminished cognitive functioning. Thus, the Court does not find that defendant's mental conditions are fabricated, and instead evaluates defendant's competency to stand trial in light of her legitimate cognitive deficits.

### 2.    Defendant's Understanding of the Legal Proceedings

As to the first prong of the competency standard, the evidence presented establishes that defendant rationally and factually understands the proceedings against her. *See Ahrendt*, 560 F.3d at 74. Notwithstanding her cognitive deficits, she has a demonstrated understanding of the essentials of the case—that is, the basic charges against her, possible defenses and relevant evidence, and the general legal procedures. *See Robidoux*, 643 F.3d at 339; *see also United States v. Robinson*, 404 F.3d 850, 857 (4th Cir. 2005) (upholding the district court's finding that a defendant was competent to stand trial because he, among other things, "appears to have *at least a minimal understanding* of legal procedures, rules[,] and expectations" (emphasis in original)). The evidence also demonstrates that defendant is receptive to periodic instruction, which can further enhance her comprehension as needed. *See Robidoux*, 643 F.3d at 339 (stating that matters related to the case may be, and indeed should be, explained by counsel and, as appropriate, the court).

#### a.    <u>Charges Against Defendant</u>

The evidence indicates that defendant understands the nature of the charges against her. During the R-CAI assessment with Dr. Schumacher, she stated that she faces felony charges, and consistently identified the charge for "child pornography." (Schumacher Report at 13-14). Although she struggled to recall the formal name of the sexual-exploitation charge, she accurately described the conduct that gave rise to it, stating that she is accused of both "taking picture[s] of private parts" of children at the daycare where she worked and distributing them to her co-defendant via text messaging. (*Id.* at 13). Similarly, during the ECST-R assessment, she exhibited essentially no impairment when explaining the circumstances and actions that led to her two charges. (Tr. Day 1 at 40).

It is true that during her evaluation with Dr. Schumacher, defendant appeared uncomfortable speaking about the alleged offense. (Schumacher Report at 15). However, she attributed that discomfort to her apprehension about the nature of the allegations, not a lack of understanding of the allegations themselves, suggesting that she in fact appreciates the serious nature of her conduct. (*Id.*). During her evaluation with Dr. Schumacher, she also noted her understanding that she faces 15 to 20 years of prison time; that she would serve any sentence in federal prison; and that she may be subject to additional penalties including being prohibited from being "around children." (*Id.* at 14).

Defendant's responses during the R-CAI and ECST-R were consistent with those that she provided to Dr. Adams in section 3 of the CAST*ID, where she correctly identified that she had been charged with child pornography. (Tr. Day 2 at 67-68). She again stated that she could not recall the second charge against her, but nonetheless accurately described the circumstances of her arrest. (*Id.* at 65-67). She also acknowledged that the charges were "pretty serious." (*Id.* at 68).

Dr. Adams opined that her characterization of the charges understated their severity, indicating that she lacks a rational understanding of the charges. However, given defendant's weak verbal-communication skills and her established factual understanding of the legal penalties that she faces, her description of the charges as being "pretty serious" reasonably conveys a rational appreciation for the gravity of the charges against her.[15] Again, competency is a "functional concept." *See Malmstrom*, 967 F.3d at 4. Defendant's responses during the forensic assessments with both evaluators convey a functional understanding of the charges against her. *See United States v. Rodriguez*, 2015 WL 6964671, at *6 (S.D. Fla. Nov. 10, 2015) (adjudicating a defendant competent to stand trial for possession of child pornography because he demonstrated in his R-CAI interview that he understood, among other things, the charges against him, the severity of the charges, and potential punishment that he faced).

Outside of the forensic assessments, defendant evinced an understanding of the charges against her. For example, in her interview with the Nashua police, she appeared to understand the seriousness of her alleged conduct as she initially denied having taken the photos until she was presented with evidence demonstrating her involvement in the crime. (Ex. 5 at 46:30). She then continued to engage in a logical and reciprocal conversation with the officer about the photos and the circumstances that gave rise to them. (Tr. Day 1 at 20-21). She understood that the photos may carry legal consequences for her, and she spoke coherently about the pressure that she felt from her (now) co-defendant to take the photos.

Furthermore, in her phone calls with her mother, she discussed her case with a fair degree

---

[15] As noted, the parties dispute the scores that defendant's responses deserved in section 3 of the CAST*ID. Dr. Adams assigned partial or zero credit for several responses because they omitted information that Dr. Adams deemed to be integral to a full-score answer. Dr. Schumacher disagreed and assigned defendant higher scores because the responses conveyed a functional understanding of the nature and consequences of the proceedings. Again, the Court accepts Dr. Schumacher's conclusions, and finds that defendant's responses reflect a rational understanding of the facts and the severity of the charges, notwithstanding her limitations.

of logical coherence.  For example, she discussed material contained in discovery records, again indicating that she has a grasp of the legal proceedings against her.  (*Id.* at 54-55).

Taken together, the evidence indicates that defendant factually and rationally understands the specific conduct that underpins her arrest; the basic charges against her, if not the technical legal details; the overall severity of her case; and the likely consequence of a significant prison term.

### b.    Possible Defenses and Relevant Evidence

Defendant has also demonstrated an understanding of the evidence relevant to her case and the possible defenses that she may assert.  As Dr. Schumacher reports, during her evaluation, she rationally discussed information relevant to her possible defense strategies.  (Schumacher Report at 15).  In the R-CAI assessment—which measures, among other things, a defendant's understanding of her available defenses—she recognized that the outcome of her case would be determined based on the evidence presented at trial.  (*Id.* at 14).  She also correctly identified evidence that could be used for and against her, and discussed the government's potential use of the alleged daycare-center photos in its case against her.  (*Id.* at 15).

Furthermore, defendant expressed an understanding of basic litigation strategies that may be employed in her defense.  She discussed the plea process and stated that a not-guilty plea means that she "didn't do" the crime.  (*Id.* at 14).  She understood that she would receive a not-guilty verdict only if there was insufficient "evidence for the charges" against her, and that her counsel's job is to use the evidence to assist her in securing a not-guilty verdict.  (*Id.* at 14-15).  She also stated that she would evaluate any plea offer with counsel's input.  (*Id.* at 14).  Although she expressed some confusion about the exact sequencing of any plea negotiation, she nonetheless appeared to understand the basics of the plea process to a reasonable degree.  *See*

*United States v. Hogan*, 986 F.2d 1364, 1373 (11th Cir. 1993) (stating that competency does not require a sophisticated comprehension of the defense).

Defendant therefore has a sufficient understanding of the evidence relevant to her case, the role it plays in determining the outcome of the case, and the ways in which it may be used in her defense. And, again, she repeatedly exhibited a competent understanding of the relevant facts that gave rise to the charges, further indicating that she has the capacity to identify and evaluate possible defenses and weaknesses in her case.

### c.    Legal Procedure

The evidence also demonstrates that defendant understands the basics of the legal process. During the ECST-R, she exhibited a factual understanding of the trial process. (Schumacher Report at 11). She also rationally explained the potential outcomes of her case, including the possibility of substantial prison time. (Tr. Day 1 at 40).

Similarly, during the R-CAI, defendant correctly characterized the roles and responsibilities of court personnel, including defense counsel, the jury, and the prosecutor. (Schumacher Report at 13). She understood the basics of pretrial release and the plea-bargaining processes, and shared that the outcome of her case turned on the "proof" against her. (*Id.* at 14-15). And in conversations with her mother, she again accurately explained the role of the prosecutor, and exhibited a developed understanding of the posture of the case against Laughton, along with potential outcomes for that case going forward.

Defendant's grasp of basic legal procedure was evident during her evaluation with Dr. Adams as well. For example, on section 1 of the CAST*ID exam—which measures an examinee's grasp of basic legal concepts—she received a score well above the typical threshold for legal competency. (Adams Report at 15). During her October 30, 2023 interview with Dr. Adams, she correctly noted that the jury decides her guilt. (*Id.* at 13). And during her follow-up

evaluation with Dr. Adams on December 9, 2024—during which she was largely non-responsive—she was nevertheless able to share basic information about the role of the judge and counsel.  (Adams Add. at 5).

Defendant also showed that her understanding of the courtroom processes could be enhanced when provided with educational guidance.  After brief instruction from Dr. Schumacher, she was able to identify accurate and relevant examples of fact, character, and expert witnesses, even though she initially could not explain the differences between the three.  (Tr. Day 1 at 43).  She also fairly described the role of the judge after Dr. Schumacher educated her on the topic.  (Schumacher Report at 13).  And during her recorded telephone calls with her parents, on multiple occasions, she accurately relayed information that Dr. Schumacher had shared with her about the trial process.  (Tr. Day 1 at 52).

In sum, the evidence reflects that defendant has a sufficient understanding of the legal procedure, and that her understanding can be further enhanced through limited and periodic instruction.  Accordingly, she possesses the requisite capacity to factually and rationally understand the legal proceedings against her to be deemed competent.

### d.    <u>Defendant's Impaired Cognitive Functioning</u>

Defendant asserts that her impaired cognitive functioning interferes with her ability to comprehend even the basic elements of her case.  Her weak cognition is evidenced by her performance on the WAIS-IV, in which she scored at or below the 10th percentile on every category, including verbal comprehension, processing speed, and perceptual reasoning.  (Adams Report at 9-10).  She also registered an IQ of 71, approximately two standard deviations below the mean of 100.  (*Id.* at 10; Tr. Day 1 at 177, 194).  Defendant's performance on the WAIS-IV led Dr. Adams to assign a BIF classification and contributed to her opinion that defendant is not competent to stand trial.

However, Dr. Schumacher noted that defendant's performance on her cognitive assessments varied, and that at other times, she showed reasonable, albeit low-average, cognitive abilities.  (Schumacher Report at 8).  Contrary to her performance on the WAIS-IV, in the WJ-IV COG, she demonstrated an ability to reason, form concepts, and solve problems.  (*Id.*).  Her WJ-IV COG performance likely even understated her true cognitive functioning given her VIP score.  Thus, although the cognitive assessments present a mixed picture, they nonetheless suggest that she has at least the cognitive capacity to understand her case.

Other evidence beyond the cognitive assessments bolsters that conclusion.  For example, defendant successfully graduated from high school and then received an AA degree from community college.  (*Id.* at 4).  Although she required support from her parents and counselors throughout her educational career, she nonetheless exhibited a sufficient baseline capacity to earn those degrees with proper accommodations.  Moreover, at later points, she concurrently worked multiple jobs, and was most recently employed as a daycare teacher.  Until her arrest, she had not been fired and had never received disciplinary action from an employer.  (*Id.* at 5).  And since being in prison, she has not had any behavioral issues or difficulties communicating or engaging in daily activities at the prison facility, and has also exhibited good hygiene and self-care.  (*Id.*); *see United States v. Carter*, 2013 WL 6668715, at *3 (E.D. Tenn. Dec. 18, 2013) (finding that a defendant's objective behavior, including caring for hygiene and following prison-facility rules, demonstrated an adequate level of understanding for competency); *see also United States v. DeLeon,* 2017 WL 2297040, at *24 (D.N.M. May 1, 2017) (deeming a defendant competent after noting, among other things, that a defendant "presented well-groomed and hygienic at all times").  Her ability to capably function in educational, professional, and

incarcerative contexts suggests that she is not so cognitively impaired that she cannot understand her present context.

Dr. Adams testified that defendant's apparent day-to-day functioning overstates her ability to comprehend the more difficult concepts that arise in legal settings.  She further asserts that her responses to legal questions—such as those that she responded to during her forensic assessments—may have been a product of masking rather than genuine comprehension.  (Tr. Day 1 at 181).  According to Dr. Adams, by parroting back phrases that she heard in the questions presented, her responses may have exaggerated her true understanding of legal matters.

However, several of the questions presented during the forensic assessments were structured in a way that limited the possibility of masked responses.  The ECST-R involved true-false questions, while sections 1 and 2 of the CAST*ID involved multiple-choice questions. Neither of those question styles lend themselves to parroting, yet she performed well above the threshold for competency on each of those sets of questions.  As for the open-ended questions that she faced in the R-CAI and section 3 of the CAST*ID, the questions appear to be largely devoid of leading phrases or other hints that would allow for effective masking.  (Tr. Day 2 at 64).  Indeed, her responses appear to include information that was not present in the questions themselves, such as the charges that she faces and the evidence against her.

Furthermore, in speaking with the Nashua police officer on the day of her arrest, defendant did not simply repeat the officer's questions, but instead provided new information on a range of topics.  Similarly, in calls with her parents, she did not resort to reciting the phrases that she heard on the calls, but rather offered independent responses about her legal case and her acquaintance's case.  Neither situation reflected a parroting back of statements, but rather showed that she can process and provide new information while engaging in reciprocal

conversation about legal matters.  *See Marks*, 2022 WL 8227893, at *25.

Again, there is no doubt that defendant suffers from cognitive deficits.  But impaired cognitive functioning is not a *per se* bar to a finding of competency.  *See Malmstrom*, 967 F.3d at 5; *see also Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995) ("[N]either low intelligence [nor] mental deficiency . . . can be equated with mental incompetence to stand trial.") (citing *McCune v. Estelle*, 534 F.2d 611, 612 (5th Cir. 1976)).  And multiple courts have determined that defendants with low-level cognition are competent to stand trial when the evidence suggests that they are capable of understanding the basics of the proceedings against them.  *See Robinson*, 404 F.3d at 857; *see also United States v. Fuenmayor-Arevalo*, 490 F. App'x 217, 222, 225 (11th Cir. 2012) (affirming finding of competency where the defendant was "mildly to moderately mentally retarded since childhood," registered an IQ of 52, and potentially suffered from dementia, where the evidence nonetheless demonstrated that defendant, among other things, had expressed "rational responses and understanding of the roles of the judge, prosecutor, and defense attorney in his criminal case"); *Rodriguez*, 2015 WL 6964671, at *14 (deeming a defendant competent—despite an IQ of 73, an autism-spectrum-disorder diagnosis, and a BIF classification—because he communicated a sufficient understanding of the essentials of his case).

In *Robinson*, for example, the Fourth Circuit upheld the district court's determination that a defendant was competent despite his "borderline functional" IQ score of 70 and his "variety of mental disorders" that included "attention-deficit/hyperactivity disorder . . ., reading disorder, mathematics disorder, expressive language disorder, provisional polysubstance abuse, schizotypal personality disorder, and borderline intellectual functioning."  404 F.3d at 857. Based on the evidence that defendant "at least minimally . . . underst[ood] the nature and

consequences of the proceedings against him," the court concluded that the defendant was properly adjudicated competent, even though he again "appear[ed] to be of low intelligence and to have several mental disorders." *Id.* at 857-58.

Here, defendant's IQ score is approximately equivalent to that of the defendant in *Robinson*, and is substantially higher than that of the defendant in *Fuenmayor-Arevalo*.  Like those defendants, she suffers from a disorder affecting her verbal-processing skills.  And like both cases, the record here contains substantial evidence that she understands the nature and consequences of the proceedings against her, despite her impaired cognitive abilities and diagnosed disorders.  *See Singletary*, 59 F.3d at 1107.  Thus, defendant satisfies the first element of the competency standard.

### 3.      Defendant's Ability to Assist in Her Defense

As to the second prong of the competency standard, the evidence establishes that defendant is sufficiently able to consult with her attorney for the purpose of assisting in the preparation and presentation of her defense.  *See Malmstrom*, 967 F.3d at 5.  She has demonstrated an ability to meaningfully discuss relevant evidence, including the facts and circumstances of her arrest.  *See Marks*, 2022 WL 8227893, at *34.  She has also shown that she understands potential alternatives to trial, recognizes her right to not testify, and appreciates the importance of collaborating with counsel to evaluate litigation decisions.  *See id.*

### a.      Evidence of Communication Skills

During the ECST-R, defendant exhibited essentially no impairment in her ability to consult with counsel.  (Schumacher Report at 11).  Without using any notes, she explained the specific types of evidence that would be relevant to her attorney, including both helpful and harmful evidence.  (Tr. Day 1 at 40-41).  Similarly, during the R-CAI, she understood that the determination of her guilt would be based on the evidence, and again correctly identified

potential evidence that the government may use against her.  (Schumacher Report at 14).

At another point in the R-CAI, defendant demonstrated that she understood her right to choose not to testify, and importantly, stated that she would only make that decision with counsel's advice.  (*Id.*).  She also reflected on her capacity to testify, stating that she would likely feel nervous doing so, but that she had, in the past, been able to remain calm during court proceedings.  She also expressed an understanding of the plea-bargaining process, and reiterated that she would evaluate any plea offer with her counsel's guidance.  (*Id.*).  Although she expressed some confusion about the timing of any plea agreement, Dr. Schumacher attributed that confusion to her lack of familiarity with the legal process; the competency standard does not require a defendant represented by counsel to be able to navigate the litigation process alone, and her acknowledgement that she would work with counsel to evaluate any plea offer indicates that she has a sufficient capacity to seek advice from counsel for the purpose of assisting in her defense.  *See Indiana v. Edwards*, 554 U.S. 164 (2008) (holding that the competency threshold for defendants represented by counsel is lower than that for self-represented litigants).

As a related matter, throughout the evaluation with Dr. Schumacher, defendant articulated a reasonably clear understanding of the attorney-client relationship and the role of her attorney in representing her.  She has also expressed that she trusts her counsel and will work with her throughout her defense.  (Schumacher Report at 15).  Her understanding of the attorney-client relationship is corroborated by her performance on section 2 of the CAST*ID assessment—which is titled "Skills to Assist Defense" and specifically measures a defendant's understanding of the role of the attorney—where she scored well above the typical threshold for legal competency.  (Adams Report at 15).

Defendant's conversations with her parents—during which she discussed various aspects

of her case with no meaningful delay or confusion—further establish that she is capable of speaking clearly and meaningfully about her case. (Schumacher Report at 7). During those calls, she intelligibly discussed prior court proceedings, her attorney's work and performance, and information contained in discovery records. (Tr. Day 1 at 50-51, 54-55). She also engaged in fluid reciprocal conversation and provided general updates about her life, including the food and activities available in the prison facility. *See Marks*, 2022 WL 8227893, at *25 (deeming a defendant competent despite his documented language disorders because, in part, his monitored phone calls with his parents revealed an ability to speak clearly, engage in reciprocal conversation, and generally "take care of himself").

Dr. Adams testified that defendant's fluid conversation with her parents stems from her long-standing familiarity and comfort with them. (Tr. Day 1 at 187). She asserts that in other contexts involving people who do not have a similar rapport with her, she struggles to communicate effectively. (*Id.*). While that is no doubt true, the record reveals multiple instances in which she has communicated about her case in a functional manner without her parents present. *See Malmstrom*, 967 F.3d at 4. For example, in her interview with the police, she discussed the illicit photographs on her phone, appeared to understand the gravity of her alleged actions, and asserted that Laughton pressured her into taking the photos. (Tr. Day 1 at 20-21). She did not exhibit significant verbal delays or conversational impediments during that interaction, suggesting that she possesses sufficient ability to communicate about her case. *See United States v. Merriweather*, 2014 WL 5770213, at *63 (N.D. Ala. Nov. 5, 2014) (finding that a defendant could adequately and rationally communicate about his case because, among other things, the defendant "communicat[ed] intelligently and coherently with investigators on the day after the [crime]").

Moreover, throughout her interviews with Dr. Schumacher, defendant adequately discussed different aspects of her case without her parents present. Although she at times required questions to be repeated and additional time to respond, she nonetheless was able to engage in logical and coherent conversation with Dr. Schumacher. She also exhibited an ability to develop rapport with Dr. Schumacher over time, indicating that she is reasonably capable of overcoming any initial discomfort that she may have when working with new people. (Schumacher Report at 15).

In any event, defendant has stated on multiple occasions that she has a strong and trusting relationship with counsel and has demonstrated a capacity and commitment to working with counsel to navigate her defense. (Tr. Day 1 at 39-40; Schumacher Report at 14-15).[16] The evidence therefore demonstrates that she can communicate with others about her case to assist in her defense in a meaningful and functional manner.

### b.     Lack of Responsiveness at Meetings with Counsel and Dr. Adams

It is true that defendant exhibited varying degrees of responsiveness during the evaluation periods. Both evaluators noted that she periodically provided delayed responses and on multiple occasions stated that her "brain and mouth sometimes don't work together." (Schumacher Report at 7; Adams Report at 7). Both evaluators similarly observed that her verbal-processing skills worsened when confronted with difficult questions. (Schumacher Report at 7; Adams Report at 7). Based on those observations, both evaluators concluded that she has a language

---

[16] Dr. Adams also reported that defendant "blind[ly]" trusts authority figures, such as police officers, parents, and attorneys, and that she therefore makes decisions based on their guidance without even having a rational understanding of her own context. (Adams Report at 19-20). However, defendants are expected to rely on their attorneys for advice in the litigation process. *See Robidoux*, 643 F.3d at 339. And the evidence indicates that defendant has a sufficient rational understanding of her case and that she understands that she is meant to collaborate with, as opposed to blindly trust, counsel in making strategic decisions in relation to her defense. (Schumacher Report at 14).

disorder and a form of anxiety.  (Schumacher Report at 10; Adams Report at 17).

Defendant's verbal-processing deficiencies were acutely evident during her meeting with counsel on October 17, 2024, and at her follow-up evaluation with counsel and Dr. Adams on December 9, 2024.  At those sessions, she appeared unable to answer several questions concerning her case and the litigation process.  She asserts that her poor communication during those two sessions reflects an overall inability to effectively assist in her defense.

However, as Dr. Schumacher testified, defendant's behavior on October 17 and December 9 was strikingly inconsistent with her observed level of functioning at other times, including during the evaluation period.  (Tr. Day 1 at 47, 86).[17]  In an evaluation with Dr. Schumacher the day before her October 17 meeting with counsel, she successfully answered many of the same questions that her counsel posed, indicating that she does have the capacity to communicate effectively about her case.  Although she requested that Dr. Schumacher repeat certain questions, she was responsive throughout the session.  Furthermore, Dr. Adams's notes from the CAST*ID reveal that she similarly responded logically and accurately to several questions about her case with only occasional delays.  And, again, outside of the formal evaluations, she discussed her case with her parents and with the Nashua police officer with no significant delays or difficulties.

Defendant's limited responsiveness at the two meetings with counsel and Dr. Adams appears to be attributable to multiple factors that do not render her incompetent to stand trial. First, a few days after the October 17 interview with counsel, she reported that she found

---

[17] Defendant correctly notes that Dr. Schumacher's report does not address the December 9 follow-up evaluation because it was issued approximately one month prior.  (Def.'s Rep. at 4 n.2).  However, Dr. Schumacher testified at the competency hearing that she reviewed the video recording of the December 9 evaluation and that it was also "inconsistent with additional data points available to [her]."  (Tr. Day 1 at 86).

counsel's phrasing of the questions to be confusing.  (Schumacher Report at 12).  The questions were largely focused on her recollection of certain statements—a known weakness for defendant—as opposed to her general understanding of the case, which was the subject of the questions she encountered in the ECST-R, R-CAI, and CAST*ID, where she performed considerably better.

Next, defendant noted that she felt embarrassed and nervous discussing the factual allegations of her case at the meeting—a feeling that was made worse by the fear that she tends to experience in legal settings.  (*Id.*; Tr. Day 1 at 47).  However, as Dr. Schumacher opined, notwithstanding her anxiety, the evidence demonstrates that she could discuss her case in other situations, including with her parents and with the police officer.  Yet even in the evaluative context, Dr. Schumacher reported that her discomfort dissipated "[a]s rapport was established," and that, over time, she was "forthcoming" about the evidence that could be used for and against her at trial.  (Schumacher Report at 15).

Similarly, at an October 30, 2023 meeting with counsel—the first interaction with counsel that Dr. Adams observed approximately one year earlier—defendant responded in a cooperative manner to every question presented, demonstrating that she can collaborate with counsel.  (Adams Report at 13).  Consistent with her observed abilities throughout the evaluation period, she struggled to recall certain factual details about her case during that session; however, she successfully accepted and learned from instruction provided to her by counsel, further establishing that she can meaningfully communicate with counsel.  (*Id.* at 13-14).  Although she may feel very apprehensive about her case and the legal process—which, of course, is entirely reasonable—the evidence reveals that she can nevertheless adequately discuss the matter with counsel and others to participate in her defense.

Moreover, the structure of the December 9 follow-up evaluation with Dr. Adams and counsel was not well-tailored to defendant's known limitations. Dr. Schumacher testified that competency evaluations are best performed without attorney participation, because attorneys are not typically trained to ask clinical questions in the proper form, thereby influencing the outcome of the evaluation. (Tr. Day 1 at 89-90). Dr. Schumacher opined that counsel's style of questioning at the December 9 evaluation—much like at the October 17 interview—focused on defendant's recall of specific conversations, rather than on her core understanding of the case. (*Id.* at 86). For example, to probe her understanding of the role of the judge, counsel asked if she "remember[ed] what [they] spoke about," as opposed to asking simply whether she understood the judge's role. (*Id.*). The evidence suggests that the framing of questions affects her ability to process and communicate her understanding of certain concepts; that limitation, however, does not render her unable to assist in her defense. *See Marks*, 2022 WL 8227893, at *37 (stating that defense counsel may be expected to engage in a style of questioning that has been shown to be effective in eliciting responses from a defendant with impaired verbal-communication skills).

Furthermore, Dr. Schumacher pointed out that at various points during the December 9 follow-up evaluation, Dr. Adams and defense counsel posed multiple questions to defendant at once, which tended to interfere with her ability to process and respond effectively. (Tr. Day 1 at 86). Dr. Schumacher testified that individuals with poor processing abilities struggle to understand and adequately respond when faced with "multiple questions . . . from multiple individuals." (*Id.*). Defendant's responsiveness at the December 9 meeting therefore appears to have been affected, at least in part, by the structure and style of the questioning, hindering her ability to convey her true comprehension of the case.

Finally, again, the evidence contains numerous other examples of defendant effectively

communicating about her case with negligible delays, suggesting that the October 17 and December 9 meetings with counsel and Dr. Adams presented unique challenges to her, or, at a minimum, were not fully representative of her capacity to assist in her defense. *See Marks*, 2022 WL 8227893, at *25. Although there is no question that she has a *bona fide* language disorder and contextual anxiety, she has repeatedly displayed a capacity to appreciate and discuss the evidence; to recognize the role of her attorney in assisting her throughout the litigation process; to understand her right to testify; and to trust and collaborate with her attorney. She certainly may benefit from targeted education and an open-ended questioning style; however, those adaptations do not render her unable to understand and participate in her case. *See id.* at *37 (stating that although "the evidence shows that [the defendant] possesses some language limitations, those limitations do not equate to a finding of incompetency").

Again, there is no requirement that defendant be able to "in real-time, or near real-time, intelligently assist counsel" at trial. *See Bennett*, 2017 WL 2625070, at *16. Rather, defendant must only be able to meaningfully assist counsel. The evidence indicates that she has the capacity to do that. *See Fuenmayor-Arevalo*, 490 F. App'x at 222, 225; *Rodriguez*, 2015 WL 6964671, at *14.

Accordingly, the Court finds that defendant is sufficiently capable of assisting in her defense, and therefore satisfies the second prong of the competency standard.

### D.    <u>Accommodations</u>

As Dr. Schumacher observed, defendant has demonstrated a receptivity to periodic instruction to enhance her understanding of legal matters, and may therefore benefit from limited accommodations at trial. (Schumacher Report at 16-17). Although the bulk of any instruction ought to occur outside of the courtroom setting, the Court will consider appropriate

accommodations at trial—for example, allowing intermittent breaks to allow defense counsel to speak privately with defendant, as may be reasonably needed.

Defendant has pointed to authority asserting that "granting accommodations to slow the pace of proceedings and to try to explain the meaning of legal phrases . . . is simply acknowledging that [d]efendant is not competent."  *United States v. Valentine*, 2025 WL 1349440 (M.D. Fla. May 7, 2025).  That view is surely overstated.  The Court's finding that defendant is competent is not dependent on providing accommodations at the trial.  Rather, such accommodations could prove helpful to defendant.  And accepting the view of the *Valentine* court would surely discourage the use of any accommodations, even when they may be desirable to help ensure a fair trial.  Finally, and in any event, competence to stand trial does not require that a defendant be able to immediately comprehend, process, and respond to ongoing trial proceedings.  *See Atkins v. Virginia*, 536 U.S. 304, 318 (2002).

In summary, the Court acknowledges that in light of her various deficits, defendant may benefit from additional flexibility throughout the proceedings to ensure that she can assist properly in her defense.  The precise form of those accommodations need not be determined at this point in the proceedings.

## III.  <u>Conclusion</u>

For the foregoing reasons, and by a preponderance of the evidence and assuming that the government bears the burden of proof, the Court finds that defendant is able to (1) understand the nature and consequences of the proceedings against her and (2) properly assist in her defense.  She is therefore competent to stand trial under 18 U.S.C. § 4241.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  August 12, 2025                    United States District Judge