**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA        )
       )
     v.                    )     No.: 1:23-cr-10202- FDS-1
       )
LINDSAY GROVES

### DEFENDANT'S SENTENCING MEMORANDUM

Lindsay Groves is a 42-year-old woman with educational limitations and cognitive delays. She is shy, easily manipulated, and presents as much younger than her age. Despite her age, she is entirely dependent on her parents. Apart from her incarceration, she has never lived away from her parents for more than a few days. In one of her few attempts at an independent adult life, she began a relationship with her co-defendant, Stacie-Marie Laughton. During their on-again/off-again relationship, which spanned several years, Ms. Laughton psychologically manipulated and abused Ms. Groves. The conduct charged here grew out of this abuse.

Ms. Groves comes before this Court deeply ashamed of her behavior, extremely remorseful, and confident that her life will never again lead her to harm children. Specifically, "Ms. Groves …presents at a low risk for sexual offense recidivism with a concurrent low and limited degree of dangerousness to the public at large."[1]

The Supreme Court, in *Pepper v. United States*, emphasized the principle underpinning federal sentencing that "the punishment should fit the offender and not merely the crime." 562 U.S. 476, 487-88 (2011) (internal quotations omitted). Ms. Groves's significant mitigating personal history, ███████████████████████████████████ ███████ as well as the aberrant nature of her conduct are factors that must be considered in applying 18 U.S.C. § 3553(a) and in crafting a sentence that is "sufficient, but not greater than

---

[1] Dr. Guidry Report, pg. 20.

necessary" to serve the purposes of sentencing. *United States v. Kimbrough*, 128 S. Ct. 558 (2007); *United States v. Booker*, 125 S. Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

Ms. Groves has pled guilty to three counts of Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a)&(e), and one count of Distribution of Child Pornography in violation of 18 U.S.C. § 2252(b)(1). Counts 1 through 3 carry a mandatory minimum of 15 years. Ms. Groves provides this memorandum to assist the court in sentencing her. For the reasons that follow, Ms. Groves submits that a sentence of 180 months (fifteen years) in prison followed by five (5) years of supervised release is sufficient, but no greater than necessary to meet the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## I.  18 U.S.C. 3553(a): HISTORY AND CHARACTERISTICS OF LINDSAY GROVES

At 42 years old, Ms. Groves is still entirely emotionally dependent on her mother and father[2]. Every night she calls from jail to tell her mother what she had for dinner. They talk about Ms. Groves's daily activities, and Ms. Groves asks for updates on the family's rescue dog, Blake. Sally and Ms. Groves end each call with a sing-song routine, sending kisses and singing "nutsy cuckoo" in honor of Ms. Groves's deceased cat, Smokey. These conversations are largely identical, with little variation in the subject matter, and are often extended by Sally's conversational prompts.

Though she is several decades into adulthood, Ms. Groves's ████████████ ████████████████████████ make her present as immature and much younger than her biological age. As described by Dr. Tina Adams, "[Ms. Groves] has a quiet, timid, reserved demeanor with intermingled naivety."[3] Her personal history and characteristics, combined with

---

[2] Ms. Groves's mother, Sally Groves, and father, Michael Groves, shall be referred to as "Sally" and "Michael" respectively, throughout this sentencing memorandum.

[3] Report of Dr. Tina Adams, Exhibit 14 to Competency Proceedings, ECF No. 211.



---

[4] Ms. Groves has a paternal half-sister, Jennifer. It is reported that Michael lost contact with his oldest daughter shortly after she was one year old and contact between them had not occurred until approximately thirteen years ago, when she reached out to him. Ms. Groves was 26 years old when she met her half-sister for the first time. *See Adams Report and PSR* ¶

[5] Adams Report, pg. 5.

[6] Hudson Litchfield School Records, Exhibit 10 to Competency Proceedings, ECF No. 211.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████ It can be relatively easy to make your way through the world when, in the winter, you can join in complaining about the weather, or the well-being of a family pet when a neighbor inquires. It is much different for a person to actually live on their own – pay the mortgage, talk to an insurance company about a bill, or call a health insurance provider to dispute a claim. Ms. Groves cannot do these things. ████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

---

[7] https://www.census.gov/quickfacts/fact/table/hudsontownhillsboroughcountynewhampshire/AGE295224

[8] Adams Report, pg. 17.



### ii.     *Social Difficulties and Childhood Bullying*

Ms. Groves was always, and continues to be, extraordinarily shy. She had a hard time trying

---

[9] Guidry Report, pg. 18

to make and keep friends. As Sally explains, "she just didn't know what to say." She liked being around other kids, she just didn't know how to engage with them.

When she was seven, Ms. Groves became involved in sports. Ms. Groves had wonderful coaches who supported and encouraged her. Sally reports that Ms. Groves started to interact with other kids when she became part of a team. Playing sports "helped her come out of her shell." [10] She started playing in the second grade and played every year at school. [11] "Through her sports activities at school and the recreational center, [Ms. Groves] developed a friendship with Ashley. . . . . [Ms. Groves] and Ashley played on the [] team together. Otherwise, her parents say she does not have any close friends. They report that she "relates better to adults than kids her own age. She always wants to please whoever she is with." [12]

"[Ms. Groves] tends to be easily manipulated and very trusting."[13] [Her parents] recalled one instance where they had to discipline [Ms. Groves]. "In middle school, there was a girl who didn't have lunch money and Lindsay would take money from home and give it to the girl, trying to help the girl. We are not wealthy people [,] and we spoke to Lindsay and stopped her from doing this."[14]

Ms. Groves was a victim of bullying throughout school because of her speech issues and weight, both of which made her an easy target. The kids teased her for both her inability to speak, and the way her words sounded when she tried to engage. [15] Additionally, Ms. Groves is heavy set

---

[10] Adams Report, pg. 6

[11] After she graduated, she played through the Hudson Recreational Center. She also played basketball and softball through the recreational center. She continued to do so up until her legal issues and detention. *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] Her speech was further impacted as a child because of recurrent ear infections, impairing her ability to hear speech accurately. Regardless of the origin (latent or developed) her speech and cognitive challenges were apparent since she was a toddler. Adams Report, pg. 5

and was overweight as a child. The other girls bullied her for her larger size. Ms. Groves, severely limited in her ability to advocate for herself, was fortunate that Nicole, a neighborhood friend, stood up for her. Nicole was her only consistent, caring childhood friend. Tragically, Nicole passed away from an asthma attack when she was eleven years old.

That childhood bullying continues to impact Ms. Groves's perception of herself and sense of self-worth. Social science research demonstrates that being bullied as a child can cause deep consequences throughout one's life – including detriment to one's cognitive and psychological functioning. "Individuals who were bullied in childhood were more likely to have poorer physical and psychological health and cognitive functioning at age 50."[16] Undoubtedly, the combination of Ms. Groves's ██████████████████████ and the childhood bullying only exacerbated her continuing anxiety and cognitive limitations. The death of her only caring and consistent childhood friend, Nicole, in particular caused Ms. Groves to withdraw into herself and impacted her ability to form positive relationships in the future. It is not surprising that most of her adult relationships were either orchestrated by her parents or limited to family.

### iii.  Post-High School Education

While Ms. Groves completed an associate's degree in early childhood education, she struggled through the coursework for over five years — more than twice as long as the program is designed to take to complete. ████████████████████████████████████ ████████████████████████████████████ ████████████████ Michael testified at the competency hearing that Ms. Groves would bring home her homework for them to work on together. Ms. Groves would show her parents the

---

[16] Kings College London, *Impact of Childhood Bullying Still Evident After 40 Years,* Science Daily (Apr. 17, 2014), https://www.kcl.ac.uk/archive/news/ioppn/records/2014/april/impact-of-childhood-bullying-still-evident-after-40-years

assignments, and Michael and Sally would try to help her to complete the work. Michael would "just try to break things down as simple as possible, so just whatever it is, try to make things as simple as possible for her to understand."[17] He explained that often "it seemed like to me she was understanding it, but after a while, it seemed like just she wasn't catching it".[18]

He explained that helping Ms. Groves with her schoolwork was not limited to the first or second year she was attempting to obtain her associate's degree. Rather, for the entire five years that she was enrolled in the community college, Michael (and Sally) would have to break down her assignments so that she could understand them.[19] Michael stated,

> Q.  So even when Lindsay was as old as 21, were you still explaining the assignments to her?
>
> A.  Yes.
>
> Q.  Did you ever stop explaining the assignments to her up until the time she graduated?
>
> A.  No.

During community college, Sally helped Ms. Groves with her written assignments. For these written assignments, Ms. Groves would attempt to write a draft, which typically took the form of paragraphs made entirely of one incoherent sentence, and Sally would go through the draft to turn it into something coherent. This was due to Ms. Groves's inability to understand the assignment and/or difficulty in expressing a response. When Sally asked Ms. Groves if she understood what had happened in class, she was met with mixed responses. Had Ms. Groves been left on her own to complete the homework or not been permitted to re-take classes so extensively

---

[17] Competency Hearing Transcript, April 10, 2025, pg. 85, line 11-14.

[18] *Id*., at pg. 84, line 5-8.

[19] *Id*., at pg. 86.

that she essentially doubled the amount of time she spent in school, she would not have received her Associate's Degree.

### B.    Relationship with Stacie Laughton

The relationship between Ms. Groves and Ms. Laughton can only be properly understood, and criticized, from the perspective of understanding both Ms. Groves's deficits, described above, and Ms. Laughton's professional acumen, savvy, and abuse of Ms. Groves. The two met through their church several years ago, yet Ms. Groves's parents never met Ms. Laughton in person, and their relationship was conducted almost entirely over text message.

From its inception, the relationship between them was unusual, as they were never physically intimate, despite attempting to live together (for one week – which was unsuccessful and Ms. Groves moved back to her parents' home).

The intellectual disparity between Ms. Groves and Ms. Laughton is nothing short of cavernous. Ms. Laughton was an accomplished elected official who was married and purportedly caring for her dying wife. Ms. Laughton has been successfully elected to public office on several occasions; she has campaigned, shared opinions on public policy, state-wide budgets, the impact of COVID on her constituents, and police policy. Ms. Laughton hosts online events where she discusses her values and campaign goals.[20] Ms. Laughton's electoral efforts spanned nearly a decade, from 2012 to 2020. After winning elections, she served as Selectman for the City of Nashua and as a member of New Hampshire's House of Representatives. She introduced five different bills in the House of Representatives, including New Hampshire LSR2697 – prohibiting undercover law enforcement vehicles from conducting traffic stops.[21] Ms. Laughton's background

---

[20] https://www.youtube.com/watch?v=V1yGOmtnaFg – August 2020 Campaign LiveStream. Ms. Laughton refers to Ms. Groves as her "wife" on multiple occasions in this video.
[21] https://trackbill.com/bill/new-hampshire-legislative-service-request-2697-prohibiting-the-use-of-undercover-law-enforcement-vehicles-from-conducting-traffic-stops/2142323/

highlights the gap in functioning between the two, which led to the abuse and manipulation of Ms. Groves.

The two broke up and reconnected repeatedly, and the relationship was characterized by emotional abuse and manipulation. Over time, Sally and Michael became increasingly concerned for Ms. Groves and worked with an investigator to look into financial abuse.[22] Ms. Laughton's abuse of Ms. Groves was not limited to credit card fraud. She put Ms. Groves's name on the lease on her New Hampshire apartment, made false 9-1-1 calls claiming that Ms. Groves was suicidal, and lied to officers claiming that Ms. Groves was her wife.

Ms. Groves saw the version of Ms. Laughton that was largely hidden from public view: an angry person, a person who lies, steals, and engages in endless sexual banter, ratcheting up the stakes even beyond the crime charged, to include a plan to have a sexual encounter with Ms. Groves and her parents, and her sister. All of this was fueled by Ms. Laughton. It is not a coincidence that prior to this relationship, Ms. Groves never had any interactions with the police or any inappropriate sexual behavior. Ms. Groves was simply unable to navigate this type of abuse.

While § 3553(a)(6) cautions this Court to avoid unwarranted sentencing disparities, the personal dynamics between Ms. Groves and Ms. Laughton, and their unique individual characteristics provide an appropriate record upon which to distinguish their relative culpability, such that a different sentence for each would be fair and appropriate. *United States v. Reyes-Santiago*, 804 F.3d 453, 467 (1st Cir. 2015); *United States v. Rosario*, 143 F.4th 41, 49 (1st Cir. 2025) (discussing disparity between co-defendants, rather than national data).

In addition to the difference in their intellectual capacity, Ms. Laughton has a criminal record including lying to the police, bomb threats, credit card fraud, violating restraining orders,

---

[22] Report of J Arsenault, summarizing New Hampshire investigation.

and – while not criminally charged – deceiving voters by not properly disclosing her criminal record during the election. Some of these charges are related to her treatment of Ms. Groves. Coupled with the abuse and harassment of Ms. Groves, Ms. Laughton is certainly the more culpable actor, even though she was not physically present with the children. The totality of the sentencing factors shows that Ms. Groves should receive a lower sentence than Ms. Laughton, and that any disparity between the two is warranted by the facts of the case. *Rosario,* 143 F.4th 49. The *Rosario* Court discusses the disparity argument in the context of a co-defendant who had not yet been sentenced. Ms. Groves has requested to be sentenced after Ms. Laughton, for precisely this reason; that request was denied. We preemptively raise this issue to alert the Court to our concern in this area.

**C.      Evaluation By Dr. Laurie Guidry, Low Risk for Recidivism, & Application of 18 U.S.C. §3553(a)(2)(c)**

Ms. Groves was evaluated by Dr. Laurie Guidry who has written a report opining that Ms. Groves "…presents at a low risk for sexual offense recidivism with a concurrent low and limited degree of dangerousness to the public at large."[23] This conclusion, reached after four interviews with Ms. Groves, review of the nature of this offense, and relying on Dr. Guidry's extensive experience in this area, should give the Court reassurance that Ms. Groves will never reoffend in any way. This is a particularly important component of the sentencing factors in a case where the community, in particular children, were directly impacted by Ms. Groves's behavior. Despite the harm caused, Ms. Groves actions must be judged, and punished, with an understanding of who she is as a person. ███████████████████

████████████████████████████

---

[23] Guidry Report, pg. 20



### D.    Ms. Groves's Future

One day, Ms. Groves will get out of prison and begin her time in the community on supervised release. Sadly, there is no reality in which Ms. Groves will live on her own. At 42 years old, and with the exception of pre-trial incarceration, Ms. Groves has never lived on her own and has always lived with her parents.[27] Sally and Michael do not believe Ms. Groves would understand how to pay rent. She wouldn't know or understand how to set up accounts for heat or electric bills. She has never gone grocery shopping on her own or made sure the house is stocked with necessary supplies. She has no idea how to create and follow a budget. When Ms. Groves bought a car, her parents went with her. In addition to reviewing, negotiating and co-signing the loan, her parents picked out the car and negotiated the price with the sales representative. Sally and Michael understood that Ms. Groves would have accepted, and paid the price for, whatever car was presented to her without asking a single question. They knew she could not handle the transaction on her own, though she was an adult at the time. The few bills that are "in Lindsay's name" are closely monitored by Sally and Michael, who must remind Ms. Groves that they need

---

[24] Guidry Report, pg. 16

[25] Guidry Report

[26] Guidry Report, pg. 19

[27] She moved out for one week several years ago. During that one-week period, she lived with Ms. Laughton and paid no rent and no utilities. Later, Ms. Groves learned that Ms. Laughton had put her on the lease without her knowledge.

to be paid each month.

Sally and Michael have planned for a future when they are no longer alive, or well enough to care for Ms. Groves. This has required both financial and logistical planning. Though Ms. Groves has previously worked several jobs with limited tasks assigned – for menial pay – she has always lived in her parents' home. Upon release from incarceration, she will have no savings, no viable job history or skills, no rental history, and no credit. Furthermore, Ms. Groves will be a felon and will be required to register as a sex offender which will further limit her access to housing and public assistance. Her parents have worked with a lawyer to prepare documents designating who should care for Ms. Groves. Those same people are the executors of the trust they have set up for Ms. Groves, which is a disability trust that will be managed by her caregivers - either her half-sister, or her cousin, Nathan. Her parents recognize that if she were on her own, she would be taken advantage of. At the writing of this memorandum, Michael is 74 and Sally is 71. During the pendency of this case, Sally has had heart surgery. While no one can predict the future, it is incredibly likely that both of Ms. Groves's parents will die while she is in prison or be unable to care for her in a meaningful way upon her release.

## II.    NATURE AND CIRCUMSTANCES OF THIS OFFENSE

The crimes committed by Ms. Groves violated the bond between the parents and the caregiver they entrusted their children to. Ms. Groves took advantage of the young, vulnerable children in her care. While it may appear on its face as some form of consolation that the children are so young that they may never remember what occurred, their parents will have to contend with the decision to tell them later in life. This is an impossible choice, with no right answer, and represents a portion of the continued harm that the victims will experience in the future.

What is also true is that this crime would never have occurred but for Ms. Laughton's abuse and psychological manipulation of Ms. Groves. There is absolutely zero evidence to suggest that

Ms. Groves was previously disposed to a sexual interest in children, and zero evidence to suggest that Ms. Groves engaged in inappropriate actions towards children before the suggestions from Ms. Laughton began to flood her phone.

An apt analogy, and basis for a variance, can be found in the now repealed duress guideline, formerly § 5k2.12. There, the Court would have to find that (i) the actual intent of the person alleged to have made the threat; (ii) the subjective understanding of the defendant; and (iii) whether an objective third party could reasonably consider it to be a serious threat of physical injury (or another category of threat recognized by the guideline).The issue for the Court to decide would be whether the defendant committed the offense "because of" serious coercion, blackmail, or duress. *See United States v. Anderson,* 139 F.3d 291, 300 (1st Cir.1998) *United States v. Sachdev,* 279 F.3d 25, (2002 Zobel).

Here, Ms. Laughton's intent was very clear: she wanted Ms. Groves to do something she had never done before — take pictures of the children in her care. Ms. Groves believes that Ms. Laughton would have harmed her if she did not take the pictures. However, no objective third party could reasonably consider the threats to be real. Ms. Groves almost never saw Ms. Laughton in person. They did not live together; they did not live in the same town. But Ms. Laughton's cyber-harassment of Ms. Groves was so severe, and Ms. Groves's ability to intellectually navigate her way through this manipulation was so precarious, that to Ms. Groves the threat was real. Wrapped into this was the shame Ms. Groves felt for continuing in the relationship, her stunted foray into adult sexual relationships, and a misguided belief that what happens inside your phone is real. To an outside observer, there were many simple alternatives: Change your phone number. Call the police. Just say no. But that decision-making process was not available to Ms. Groves, and the choice to participate in this crime will now cost her many years in prison.

### III.    THE SENTENCING GUIDELINE RANGE: OBJECTIONS TO PROBATION'S CALCULATIONS

We object to the Probation's calculation of both the total offense level in this case 49, and the applicable advisory guideline term of imprisonment (1,320 months) reflected in Paragraph 143 of the Presentence Report ("PSR"). This proposed length of imprisonment is 110 years, longer than Ms. Groves, presently 42, would ever live. Numbers this exaggerated do little to assist the Court in setting a reasonable, lawful sentence.

#### A.    Stacking of Grouped Counts, § 5G1.2

To reach its proffered guideline term of imprisonment of 1,320 months, Probation combines the statutory maximum of 30 years (360 months) times three for each of Ms. Groves's convictions for Sexual Exploitation of Children, with 20 years additional for the conviction of Distribution of Child Pornography. In reaching this number of 1,320 months, Probation misapplies U.S.S.G. § 5G1.2 by using the language of 'shall' as requiring mandatory consecutive stacking of Ms. Groves's four counts of conviction. This is a misapplication because no portion of the Sentencing Guidelines are mandatory following the Supreme Court decision in *United States v. Booker,* 543 U.S. 220 (2005).

Additionally, "total punishment" is the "combined length of sentences" to be determined "*after* determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guideline range on the Sentencing Table in Chapter Five, Part A." Application Note 1 to U.S.S.G. § 5G1.2 (emphasis added); *See also* Application Note 3 (affirming that U.S.S.G. § 5G1.2 addresses the procedure for *imposing a sentence* not *calculating a guideline range* independent from the Sentencing Table). In sum "total punishment" is the sentence that this Court chooses to impose, not a Guidelines calculation or a Guidelines sentencing range.

15

After accounting for timely acceptance of responsibility, Ms. Groves's total offense level is 43, and with a Criminal History Category of 1 with no prior record of convictions, her GSR is Life. Despite this, our Courts have universally agreed that the guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351 (2007). The Court is free to reject a guideline sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id.* at 350-351. A key component of Supreme Court law, designed to ensure that the guidelines are truly advisory and constitutional, is the authority of this Court to disagree with a guideline as a matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (2007) (internal punctuation omitted) (citation omitted). *See also Rodriguez*, 527 F.3d at 231.

### B.      § 4B1.5(b) – Repeat & Dangerous Sex Offenders

Though advocates and courts alike have characterized certain specific offense characteristics and enhancements applied in the majority of child pornography cases as "all but inherent in the crime of conviction," *United States v. Dorvee*, 616 F.3d 174, at 186 (2nd Cir. 2010), the same is often true for the mechanical application of the five-level enhancement under U.S.S.G. § 4B1.5(b) with respect to "repeat and dangerous sex offenders." This enhancement, which does not require a prior conviction to apply, should be viewed with substantial skepticism in the effort to determine an individualized sentence. The Sentencing Commission reports that the enhancement now applies to more than half – 51.6 % – of all defendants sentenced under U.S.S.G.

16

§ 2G2.1.[28] And as the Commission notes, application of the "repeat and dangerous" enhancement has more than doubled since 2010, an increase drive by its application to defendants like Ms. Groves, who have less extensive or no criminal records but whose offense conduct involves more than one instance of prohibited sexual conduct, instead of to defendants with prior convictions.[29] Thus, although she does not dispute its inclusion in his guidelines calculation, the increasing prevalence of the "repeat and dangerous" enhancement undercuts its efficacy in determining relative culpability.[30]

An individualized, evidence-based sentence is required both by § 3553(a) and by the fundamental role of independent courts: "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). Here, both the applicable advisory guideline sentence range in this case and Probation's calculation in the PSR is greatly inflated, unsupported by empirical evidence, and provides little assistance to the Court in determining a just sentence that is "sufficient but not more than necessary" as mandated by 18 U.S.C. § 3553(a). A mechanical application of the guidelines cannot in these circumstances produce what § 3553(a) requires.

**CONCLUSION**

Upon consideration of all of the 3553(a) factors, the defendant requests that the Court impose a sentence of 180 months (fifteen years) in prison and five (5) years of supervised release.

---

[28] U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Production Offenses* (October 2021) at 19, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf.

[29] *Id.*

[30] To be clear, a defendant does not go unpunished for involving more than one victim in the production offense if U.S.S.G. §4B1.5(b) is discounted. The Guidelines Sentencing Manual provides that conduct involving multiple victims are not grouped. U.S.S.G. § 3D1.4. Here, this results in a five-point increase in offense level. PSR ¶ 122.

Respectfully submitted,

LINDSAY GROVES

By her attorneys,

*/s/ Jessica P. Thrall*
Jessica P. Thrall, #670412

*/s/ Eliza Jimenez*

Eliza Jimenez, #5018469
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Jessica P. Thrall, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing May 28, 2026.

*/s/ Jessica P. Thrall*
Jessica P. Thrall